By the Review Panel:
By S. Res. 445, 91st Cong., 2d Sess., the Senate referred S. 4237, a bill for the relief of Harold C. and Vera L. Adler, doing business as Adler Construction Company, to the Chief Commissioner of the Court of Claims pursuant to 28 U.S.C. §§ 1492 and 2509 (1970). The Chief Commissioner referred the case to Trial Commissioner Mastin G. White for proceedings in accordance with the rules, and designated the above-named members of the Review Panel to consider the Trial Commissioner’s report on the merits of plaintiff’s legal or equitable entitlement to recover.
After extensive negotiations, the parties filed herein a stipulation setting forth all of the pertinent facts and agreeing that plaintiff does not have' any legal claim against defendant but does have a valid equitable claim against defendant, and that plaintiff is entitled to receive the sum of $300,000 on such equitable claim.
The Trial Commissioner accepted and approved such stipulation, and his report, filed September 11, 1972, was based on its provisions. On September 25, 1972, the parties filed *811 a joint motion requesting that the Review Panel adopt the Trial Commissioner’s report.
Accordingly, since the Review Panel unanimously agrees with the Trial Commissioner’s opinion, findings of fact, and conclusions as hereinafter set forth, the Review Panel adopts the same as the basis of its recommendation that plaintiff does not have any legal claim against defendant, that plaintiff does have an equitable claim against defendant, and that there is equitably due plaintiff from defendant the sum of $300,000.
This determination is hereby submitted to the Chief Commissioner for transmittal to the United States Senate.
OPINION op the Trial Commissioner
White, Commissioner:
On December 14, 1970, by S. Res. 445,91st Cong., 2d Sess., the Senate referred the bill numbered S. 4237,91st Cong., 2d Sess., to the Chief Commissioner of the Court of Claims pursuant to 28 U.S.C. § 1492.
The bill in question, S. 4237, was entitled “A bill for the relief of Harold C. and Vera L. Adler, doing business as the Adler Construction Company.” It proposed that the Secretary of the Treasury be authorized and directed to pay to the Adler Construction Company a sum of money (the original bill did not specify the exact amount) in full satisfaction of all claims 'by such company against the United States because of losses sustained by the company in connection with a contract between it and the Bureau of Reclamation, Department of the Interior, for the performance by the company of certain work on the Pactóla Dam project near Rapid City, South Dakota.
In referring S. 4237 to the Chief Commissioner of the Court of Claims, S. Res. 445 directed that proceedings be conducted in accordance with 28 U.S.C. § 2509, and that, after such proceedings, a report be submitted to the Senate “giving such findings of fact and conclusions thereon as shall be sufficient to inform the Congress of the nature and character of the demand as a claim, legal or equitable, against the United States or a gratuity and the amount, if any, legally or equitably due from the United States to the claimant.”
*812 After the plaintiff had filed a petition on March 15, 1971, and an amendment to the petition on June 28, 1971, and the defendant had filed an answer on July 14, 1971, the parties engaged in extensive negotiations in an attempt to reach an agreement on the disposition of the controversy. The negotiations resulted in the filing on August 22,1972, of a stipulation in which the parties set out all the pertinent facts and an agreement to the effect that the plaintiff does not have any legal claim against the defendant, but does have a valid equitable claim against the defendant and is entitled to receive the sum of $300,000 on such equitable claim.
The stipulation is accepted and approved by the trial commissioner, and this report is based on its provisions.
Therefore, in accordance with the stipulated agreement of the parties, as accepted and approved by the trial commissioner, the Senate should be informed: (1) that the Adler Construction Company, a partnership composed of Harold C. Adler and Vera L. Adler, does not have any legal claim against the United States (2) that the Adler Construction Company does have a valid equitable claim against the United States; and (3) that the amount of $300,000 is equitably due from the United States to the claimant.
FINDINGS or Fact
1. At relevant times, plaintiff was a partnership consisting of Harold C. Adler and Vera L. Adler, his wife, with its principal place of business at Littleton, Colorado. (Hereinafter “Adler” will refer to the individual or the partnership as the context suggests.)
2. The case presents certain claims, totaling $1,458,788.46, in connection with the construction by plaintiff for the Bureau of Reclamation (hereinafter “Bu Rec” will usually refer to the Denver office of Bu Rec unless the headquarters office in Washington is specified as “Washington Bu Rec”) of an earth-filled dam called Pactóla Dam, at a site some 13 airline miles west of Rapid City, South Dakota. The principal claims relate to defendant’s failure fully to correct mistakes in plaintiff’s bid, unanticipated subsurface conditions, excavation overruns, disputed excavation classifications, work acceleration, and collateral matters.
*813 3. Pactóla Dam was planned and constructed as an earth and rock-filled dam, about 1,250 feet long at the crest and with a height, as described in the specifications, of approximately 230 feet above the lowest foundation. Dikes 1 and 2, 1,500 feet north of the main dam, were 2,160 feet in length and had crests level with the dam crest. Water impounded by the dam was released through an underground outlet works, consisting of a concrete-lined tunnel north of the dam and a vertical shaft giving access to water control gates. A concrete spillway bored through rock and providing for emergency overflows was located between the dam and Dike No. 1.
4. Washington Bu Bee issued an invitation for bids on Pactóla Dam on August 26, 1952, with revised bid opening-scheduled for September 30, 1952, at Bapid City, South Dakota. The invitation listed 70 items, all but three of them at unit prices. The contract was to be awarded by November 29, 1952. The Instructions to Bidders, which accompanied the invitation but expressly was not to be incorporated in the contract, provided in part as follows:
12. Withdrawal of bids. — Bids may be withdrawn on written or telegraphic request received from bidders prior to the time fixed for opening. Negligence on the part of the bidder in preparing the bid confers no right for the withdrawal of the bid after it has been opened. # $ $ $ $
17. Errors in bid. — Bidders or their authorized agents are expected to examine the maps, drawings, specifications, circulars, schedule, and all other instructions pertaining to the work, which will be open to their inspection. Failure to do so will be at the bidder’s own risk, and he cannot secure relief on the plea of error in the bid. In case of error in the extension of prices the unit price will govern.
5. The bid bond which bidders were required to file conditioned the surety’s liability on, inter alia, the contractor not withdrawing its bid within 60 days after bid opening.
6. Prior to bidding, Adler thoroughly explored the entire project site “during practically all the daylight hours” from August 28 through September 3 or 4, 1952. Some terrain was relatively smooth but much of it was quite rough, particularly the hills on each side of the damsite, which provided Bock Sources A and B. He inspected the drill logs and the Gov- *814 emment’s test pits, and saw a number of drill cores, which were largely in a state of disintegration because of their age (taken in 1939) and atmospheric exposure. Eock was in evidence in the shallow creek bottom. As a result of his detailed inspection, Adler believed he would be awarded the contract because he was more familiar with it than his prospective competitors, whose inspections had been more cursory and who (as he thought) had greater overhead expenses than Adler.
7. On September 30, 1952, bids were opened at Eapid City. Expressed in terms of extending the unit prices to estimated quantities, the 12 bids submitted ranged from Adler’s low bid of $3,761,115 to a high bid of $6,959,509. Bu Kec’s prebid cost estimate was $5,962,341, which was later reduced by $613,000 by reducing unit prices on four contract items. Thus, Adler’s bid was $2,201,226 (37 percent) under the original Bu Eec prebid estimate, and was $1,117,361 (23 percent) under the second low bid of $4,878,476, while it was $2,269,203 (38 percent) under the average of the 11 other bids submitted.
8. (a) Three Government representatives acted as a Board for opening and examining all bids on September 30, 1952. In its written report dated October 1, 1952, the Board stated in part as follows:
An examination of the low bid shows prices below the Engineer’s Estimate in practically all items from Item No. 1 through Item No. 42. Particularly drastic reductions are evident in Items 10 through 16. Totals of the amounts in those items produce a reduction of about 30 percent below the Engineer’s Estimate, which comprises the bulk of the difference below the low bid and the Engineer’s Estimate. The second low bid, that of the Guy F. Atkinson Company, shows not so drastic reduction in Items 10 through 16, with a considerable increase in price for Item No. 2. The low bidder’s prices for Items 13 through 16, excavation in rock sources “A” and “B”, are of particular concern. Almost certainly the low bidder would have to operate at considerable loss in the performance of that work at the bid prices. Compensating increases are not fomid in other bid items. A small price reduction is found in the low bidder’s drilling and grouting items. It is known that his prices probably are based on quotations from a former Bureau driller, now *815 engaged in private work, who is thoroughly familiar from past work at the site, with problems of drilling and water testing the foundations there.
It would appear that the total schedule amount shown by the second low bidder approaches the minimum which could be expected from any contractor who expected to make a profit from the work.
Í $
Recommendation Regarding Award. It is felt by the members of this Board that the low bidder could not complete the work at his bid prices without considerable strain on his financial resources. However, he is known as a conscientious and skillful contractor, and unquestionably would prosecute the work vigorously and in full compliance with the terms of the specifications. It is therefore recommended that award be made to the Adler Construction Company of Loveland, Colorado, on its low bid of $3,761,115.00, provided that the company has adequate financial resources and provided that the bonding company furnishing the performance bond is well informed concerning the prices bid in comparison with our estimate and with other low bids.
(b) Because of the disparity in Adler’s bid, Bu Bee’s legal counsel advised the contracting officer to ask Adler to confirm his bid, but this was not done.
9. Adler first learned of the sharp disparity in his bid by a telephone call from his employee at the Bapid City bid opening in the afternoon of September 30, 1952. Adler had been preoccupied with a time-consuming trial of a lawsuit against his company in Colorado since September 25, and this had precluded closer attention to the preparation, submission, and opening of his bid on the Pactóla Dam contract. Upon learning of the bid disparity, he suspected a grave error, but was unable to confer with Bu Bee representatives concerning it until October 7,1952, when a one-day adjournment in his trial involvement provided him with his first opportunity to discuss the bid disparity at the Bu Bee offices in Denver.
10. (a) As reflected by a Government memorandum of the October 7, 1952, conference between Adler and Bu Bee officials with respect to the obvious disparity in his bid, Adler informed the conferees that his surety refused to issue *816 a performance and. payment bond because of doubts about his low bid, and that because of the pressures of his trial then in process, he 'had not yet had an opportunity to review his bid, as to which he might have made a mistake. Bu Kec officials emphasized the necessity to start performance as soon as possible, and invited Adler to request in writing the Chief Engineer to delay the contract award for a reasonable period to give Adler time to check his bid figures. Adler was advised1 by Bu Bee representatives to submit his bid sheets with a covering explanation of Whatever errors he detected, which submission would then be forwarded to the Comptroller General for decision as to Whether the circumstances justified a correction of his bid.
(b) On October 7, 1952, following the conference of that day, Adler wrote to the Chief Engineer, requesting until October 16 to cheek his bid for errors and -asking that the contract award be deferred until then. He expressed ignorance of the reasons for the wide difference between his bid ■and those of the next two bidders, and indicated that he suspected errors in his bid.
(c) On October 11, 1952, Adler received a letter dated October 10 from the Chief Engineer stating that “We will withhold making the award a reasonable length of time,” recognizing Adler’s inability to avoid his current trial involvement, suggesting a conference with Adler and his surety at the earliest practicable time, and emphasizing the need to start the project as soon as possible.
11. (a) The trial which had preoccupied Adler since its commencement on 'September 25, 1952, was concluded on Saturday, October 11, 1952.
(b) On October 13, 1952, Adler advised Bu Bee by telephone that he had located some serious errors in his bid, one of which was in the amount of over $300,000, and requested a meeting with the Chief Engineer, Mr. McClellan, who was also the contracting officer, to discuss the errors and ensuing procedures. Later that day, Adler was informed that a meeting would be held the following day with the contracting officer, as requested.
(c) A contemporaneous Government memorandum reflects that Adler was informed by telephone on the morning *817 of October 14, 1952, from Bu Bee’s Assistant 'Chief Construction Engineer that, despite Adler’s objections, the contracting officer was going to award the contract that day, which would not interfere with Adler’s right to apply for a correction of his bid. However, the contracting officer agreed to withhold the award until Adler came in for a conference that afternoon.
12. Adler arrived at the scheduled conference on October 14, 1952, armed with his bid estimate worksheets and details as to arithmetical errors in six principal items, totaling $581,505. He also brought a letter requesting that his bid be rejected, or accepted with corrections, and that the contract award be deferred. At the conference, Adler explained the errors to the Bu Bee representatives who were present, attributed them to his trial preoccupation since September 25, and stated that 'both his bank financing and performance bonding were in jeopardy because of his low bid. He was advised by the conferees to 'Submit in affidavit form information 'as to the errors and how and why they were occasioned, and that they would thereupon be transmitted to the Comptroller General for advice as to bid revision, award to the next low bidder, or contract readvertising. Adler was told that “the contractor’s allegation of error would be the sole item for consideration by the GAO and that the contracting officer would not be in a position to make any recommendations.”
13. During the conference of October 14, 1952, Adler was purportedly shocked upon being informed that the contract had been awarded to him. A telegram notifying him of the award was stamped as being dispatched from Bu Bee at 3:49 p.m. on that day and received at Adler’s company headquarters in Loveland, Colorado, at 5 p.m. the same day. However, Adler denies having been informed during the meeting that he had been awarded the contract, and avers that he was not aware of it until he arrived at his Loveland headquarters following the meeting.
14. Whatever inclination Adler may have had on October 14, 1952, to refuse to perform the contract awarded to him that day unless the errors in his bid were corrected was necessarily affected by the awareness that a refusal to per *818 form could have caused cancellation of his bond of $367,000, which would, in turn, have jeopardized Adler’s financial condition and deprived him of working1 capital, both for the contract in suit and to finish other contracts which were then nearing completion.
15. On October 15, 1952, the contracting officer confirmed by telegram to plaintiff that any correction in plaintiff’s bid would have to be effectuated by the Comptroller General because the contracting officer lacked such authority, and emphasized the importance that the request be made without delay because of the 10-day period permitted by the contract for its execution and the furnishing of performance and payment bonds. Failure to execute these forms was a technical ground for forfeiture of the bid bond.
16. (a) In a sworn statement dated October 18, 1952, and submitted to the contracting officer on October 20, 1952, Adler asserted a claim based on bid errors totaling $621,505, in which he described the errors in his bid on each of seven contract items and enclosed a copy of those of his bid worksheets which were relevant to the claimed errors. These errors may be summarized as follows by contract item numbers:
No. 1: Diversion and care of stream, etc. Bid at $45,000 instead of $75,000 due to error in transposing figure from worksheet to bid.
No. 2: Excavation of 420,000 c.y. of overburden in open cut. Bid at $147,000 instead of $224,540 due to failure to include in computation the factor of $77,540 for equipment charges, as shown on worksheet but not inserted in the total or transferred to bid.
No. 5: Excavation of 1985 c.y. all classes. Bid at $45,655 instead of $63,520 due to failure to include in computation the factor of $17,865 for equipment charges, as shown on worksheet but not inserted in the total or transferred to bid.
No. 9: Excavation of 220,000 c.y. stripping in borrow pits. Bid at $41,800 instead of $51,800 due to simple error in addition on bid worksheet.
Nos. 10 and 11 collectively: Common excavation of 2,000,000 c.y. in upstream borrow area 'and transportation to embankments. Bid at $520,000 instead of $880,-100 due to failure to include in computation the factors of $311,100 for equipment charges and $49,000 for “margin,” as shown on worksheet but not inserted in the total or transferred to bid.
*819 No. 12: Common excavation of 700,000 c.y. in downstream borrow area and transportation to embankment. Bid at $175,000 instead of $301,000 due to same oversight as in Items Nos. 10 and 11, on which the computation was based.
(b) These errors were not individually apparent on the face of Adler’s bid, but were readily apparent in Adler’s bid worksheets, which Bu Bee did not have until later, although the disparity between Adler’s bid and the others was enough to excite Bu Bee’s concern.
17. The letter of October 18,1952, concluded with Adler’s request that he be excused from executing the contract according to the original bid, or that the bid be adjusted to eliminate the errors.
18. On October 31, 1952, the contracting officer wrote a memorandum to the Commissioner of Washington Bu Bee, presenting in full detail the circumstances of the plaintiff’s erroneous bid, and recommending that the Comptroller General be asked for a decision as to whether the contractor would be entitled to relief by correcting the bid errors. If so, the contracting officer recommended “that correction be allowed by appropriate reformation of the contract.” The contracting officer expressed the opinion that reformation would be “in accordance with previous decisions of the Comptroller General that the bid can be corrected if the amount of the intended bid can be established.” He advised that readver-tisement of the contract would not only result in much higher costs to the Government than if Adler’s errors were corrected, but would also delay completion of the contract for a full season.
19. In the meantime, the bid of Guy F. Atkinson Co., the second lowest bidder, contained an acceptance period limitation of 30 days, which expired October 30,1952.
20. On November 3, 1952, the Administrative Assistant to the Secretary of the Interior submitted the contracting officer’s recommendation of October 31, 1952, to the Comptroller General for a decision, with the following comment:
* * * The Chief Engineer [i.e., the contracting officer] recommends that, if you conclude that errors entitling ■the contractor to relief have been made, the contract be reformed accordingly. The Commissioner of Bec- *820 lamation and I concur in this recommendation as being in the best interest of the Government.
21. Adler was not aware of these communications until they were produced in the course of discovery proceedings in subsequent litigation.
22. (a) On November 14, 1952, Adler was advised by telephone from Bu Bee that the Comptroller General had made a decision with respect to his request for bid reformation. The following Monday morning, November 17, 1952, Adler visited Bu Bee in Denver, unaccompanied by counsel. He was informed by Bu Bee representatives that they had learned that a decision had been made by the Comptroller General on November 14, 1952, to the effect that the contract could be amended to correct the errors. Neither Adler nor the Denver office of Bu Bee had the written text of the Comptroller General’s decision, but the Bu Bee knew its contents and did not disclose them to Adler.
(b) A protracted conference with Adler was held all during November 17,1952, at Bu Bee, in which the several errors in Adler’s bid were discussed at length. Bu Bee was apparently concerned that Adler’s corrected prices for certain of the erroneous items were more than the Government’s prebid estimate for the same items, or were more than the bids of several other contractors for certain of the items, which led the Bu Bee representatives at the conference into approving increases in Adler’s defective bid, which in the aggregate were $186,240 less than Alder’s claim. The bid invitation itself had provided that “no bid Shall be considered for only part of the schedule.” In many other items, Adler’s bid was far lower than other bidders, and this was true in the aggregate as well. Upon Adler’s complaint that Bu Bee’s proposal failed to rectify fully what were clearly mistakes in the bid, Bu Bee’s principal negotiator, a Mr. Bloodgood, commented in effect “that’s all we can pay.” Adler was told that no further delay would be allowed, that he would have to sign the contract documents immediately, and that a notice to proceed must be issued that day.
(c) Toward the end of the November 17,1952, conference, an Amendatory Agreement was prepared by Bu Bee and given to Adler to sign. The agreement had not at the time *821 been signed by Bu Rec. Adler testified that he signed it without knowing its contents or being permitted to read it, but there is no credible evidence that Adler demanded an opportunity to read it or was prevented from reading it before signing it, except that the workday was purportedly drawing to a close and the contracting officer was anxious to terminate the conference. Adler was, however, aware that the Bu Rec representatives had reduced his claim of errors by $136,240 and must have been aware of the reasons given for the reduction, even though he might not have agreed with them. Adler testified that he signed the Amendatory Agreement under economic duress at a time when he feared that, if he did not sign it together with the contract itself and the supporting performance and payment bonds, his bid bond of $376,111 would be in danger of forfeiture. However, by November 17, 1952, the 10-day period for executing the contract on pain of bid bond forfeiture had long since expired, and no such action had been taken or threatened by the bonding company, so far as the record intimates.
23. The Amendatory Agreement signed by the parties on November 17, 1952, which Adler contends (as stated in finding 22) is void because of unlawful duress and lack of consideration, provided in part as follows:
Whereas, the Comptroller General of the United States, upon the basis of evidence furnished by the Contractor, has ruled (copy of decision hereto attached as Exhibit A) that there were mistakes in the Contractor’s bid, and that since the bid, if corrected in the full amount of all mistakes, would still be the low bid, it can be reformed by the contracting officer to correct said errors; and
"Whereas, the contracting officer is willing to agree to reformation and to proceed with the contract only on the basis that where correction of the mistake or mistakes as to any item results in a unit or lump sum price in excess of a conservative and fully justifiable price, the unit or lump sum price as reformed will not exceed said conservative and fully justifiable price, which principle is acceptable to the Contractor; and
Whereas, reformation of the contract as hereinafter provided is hereby determined to be advantageous to the Government both because it will permit immediate commencement of work on an urgently needed project to *822 supply water 'to the Rapid City Air Force Base, and because the .contract as reformed will result in a cost to the Government of $1,715,961 lower than the Government’s original cost estimate and $682,096.50 lower than the next low bid.
Now, therefore, the parties hereto mutually agree as follows:
1. The respective unit prices for Items 1,2, 5, 9, 10, 11 and 12 are hereby deleted from the schedule of Specifications No. DC-3788 and the contract is hereby reformed by substitution of unit and extended prices for said ■items * * * [followed by new data as to price and amount for the seven items mentioned].
# # # * *
The increase in unit and lump sum prices as above provided result in an increase of $485,265 in the total amount of the contract based upon the estimated quantities stated in the schedule.
2. In consideration of the Government’s waiving its right to rescind the contract, the Contractor hereby accepts the foregoing reformed unit and lump sum prices in full satisfaction of all of its rights arising out of or in any way connected with mistakes in its bid, notwithstanding the fact that the unit and lump sum prices stated in Article 1 hereof in several cases do not reflect increases equal to the full amount of the errors claimed by the Contractor and found by the Comptroller General.
24. Although the Amendatory Agreement of November 17, 1952, refers in the “whereas” clauses to the parties having “heretofore entered into” a contract for Pactóla Dam, and to a copy of the Comptroller General’s decision as being attached as Exhibit A, at the time the Amendatory Agreement was signed on November 17, 1952, the parties did not have possession of the Comptroller General’s decision, and Adler did not sign and deliver the contract itself until immediately following the signing of the Amendatory Agreement, but did so prior to leaving the conference. Adler did not receive a copy of the Amendatory Agreement of November 17, until November 28,1952, but there is no evidence that he demanded it earlier. Also, while the concluding “whereas” clause of the Amendatory Agreement refers to the fact that the revised contract price was lower than the next low bid *823 by $632,096.50, in fact the next lower bid had expired by its own terms prior to October 31,1952, and hence was no longer available.
25. On or about November 28, 1952, Adler received for the first time a copy of the November 14, 1952, decision by the Comptroller General, which held in part as follows:
On the basis of the facts and evidence of record there appears no doubt that errors were made in the bid. Furthermore, the evidence reasonably established that except for the errors the prices for the various items would have been as alleged. The bid of Adler Construction Company, if it be corrected, is still approximately $500,000 lower than the next-lowest bid received.
It is reported that the project involved was recently approved by Congress for immediate construction in order to make available a much needed water supply for the Rapid City Air Force Base of the Strategic Air Command, and the work is of a highly urgent nature. It is further reported that any substantial delay in the matter will make it impossible to perform the necessary initial construction work before the onset of winter weather which would result in a full season’s delay in the ultimate date when the water can be furnished to the Rapid City Air Force Base and that, therefore, readvertisement of the work is not considered to be in the best interests of the Government.
Under the circumstances, this Office will not be required to object to the correction of the bid of the Adler Construction Company on items 1, 2, 5, 9, 10, 11 and 12 to the prices hereinbefore set forth and entering into a formal contract with the company on that basis.
26. The Comptroller General totaled the bid errors to $621,465, instead of Adler’s claim of $621,505, by rounding off to the nearest cent the unit price in several of the items.
27. On July 5, 1960, the Under Secretary of the Department of the Interior wrote a letter to the Chairman of the United States Senate Committee on the Judiciary, in response to the latter’s request for the Department’s views on the then-pending private relief bill, S. 3199, for the relief of the Adler Construction Company. In the course of recommending relief for one of the three claims (and recommending against the other two) then being made by the contractor, which related to rectifying its mistake in bidding, the *824 Under Secretary made the following statements of fact and opinion which bear on the contractor’s situation on November 17,1952, when the Amendatory Agreement was presented to Adler:
It is believed that the Government has technical legal defenses (i.e., statute of limitations and failure to reserve the claim in the contractor’s release on the contract) to the contractor’s claim which would preclude his recovery in the courts. And, apart from the technical defenses, it is doubtful that on the merits the contractor could successfully establish either that duress was involved in securing his consent to the amendatory agreement, or that the amendatory agreement was invalid for lack of consideration. However, the Congress, in certain hardship situations, has granted legislative relief where the applicant does not have a legally enforceable claim but has a claim presenting strong moral and equitable considerations. Considered in this light we are of the opinion that Adler’s claim for relief insofar as claim (a) is concerned, has such compelling considerations of fairness that congressional relief would be warranted.
_ In reaching the above conclusion, a number of considerations are involved. In the first place, Adler was placed in an exceedingly precarious position by the fact that his bid was so very low in comparison with other bids and the engineer’s estimate as to raise doubt as to his ability to perform the contract without ruinous losses. This situation was complicated by the fact that he was involved at the time in litigation from which he was unable to free himself for a sufficient period to give full consideration to the problem. His situation was further aggravated by the fact that there were indications that the bonding company that had furnished his bid bond would not furnish a performance bond to support the contract, and in such event, his bid bond in the amount of $376,000 would have been subject to forfeit. This would have had very serious consequences, in all probability resulting in Adler’s complete financial ruin. Additionally, the Government’s urgent need to get the work under way impelled it to make the rather precipitous award of contract, notwithstanding the fact that Adler had given verbal notice of serious errors in his bid. Although the award was not made with any intention to prejudice Adler’s position, it is obvious that the Government’s necessity dictated a course of action which placed him in a most difficult position.
*825 With regard to the negotiations as a result of which Adler was induced to accept the amendatory agreement, personnel who were present at the meeting recall that Adler appeared in response to a telephone call, and was unaccompanied by legal counsel or associates. He offered no serious opposition to the Government’s proposal and accepted the proposal precisely as it was made. At the time these negotiations took place, it seemed to the Government personnel involved a proper course of action in the discharge of their responsibilities. However, viewed in retrospect, it is considered that they were overly zealous in their desire to safeguard the Government’s financial interests, and that the contractor, subject to such pressures as he was under at the time, had or at least thought that he had almost no alternative to accepting a proposition that was seriously adverse to his interests and one that it is now felt, in good conscience, the Government should never have made.
Even with Adler’s bid corrected in the full amount of the error foimd by the Comptroller General, it would still be some $600,000 below the next low bid and approximately $1,000,000, or 25 percent below the revised Government estimate. It is apparent that even with the error as allowed by the Comptroller General, the Government had the advantage of an exceedingly low bid. As a result of performing the contract at the contract price, including the prices in the amendatory agreement, the contractor suffered continuous financial losses, and he has been forced to sell much of his construction equipment. Since completing the Pactóla Dam job, he has been unable to secure bonds covering jobs of any substantial volume of work, and has been confined largely to subcontracting small jobs from other contractors.
In view of the foregoing, it is the opinion of the contracting officer, in which this Department concurs, that claim (a) submitted by the Adler Construction Co. in S. 3199 contains such elements of equity and fairness that relief legislation to the extent of $136,532.86 is warranted. [Emphasis supplied.]
28. Notice to proceed with the work under the contract was issued on November 17, 1952, thus establishing June 25. 1955, as the original contract completion date (950 days). Time for the performance of the contract was ultimately extended to August 15, 1956. No liquidated damages were as *826 sessed, although the prospect existed until late in contract performance.
29. The contract contained the following standard Changed Conditions clause:
Article 4. Ghcmged conditions. — Should the contractor encounter, or the Government discover, during the progress of the work subsurface and/or latent conditions at the site materially differing from those shown on the drawings or indicated in the specifications, or unknown conditions of an unusual nature differing materially from those ordinarily encountered and generally recognized as inherent in work of the character provided for in the plans and specification's, the attention of the contracting officer shall be called immediately to such conditions before they are disturbed. The contracting officer shall thereupon promptly investigate the conditions, and if he finds that they do so materially differ the contract shall, with the written approval of the head of the department or bis duly authorized representative, be modified to provide for any increase or decrease of cost and/or difference in time resulting from such conditions.
30. As the work under the project progressed, the plaintiff encountered subsurface or latent conditions at the site of the main dam foundation materially different from those shown in the drawings and specifications, which made excavation and refill work much more difficult and costly. The defendant became aware of the conditions as they were uncovered by the plaintiff. The conditions to be described in subsequent findings are confined to the foundation for the main dam and, unless otherwise specified, do not relate to other parts of the project.
31. (a) The major claim of the plaintiff is that foundation surfaces acceptable to the Government under the main dam-site were reached at substantially greater excavated depths below original ground surface than the contractor was led to anticipate from his inspection of the site and examination of the contract drawings, specifications, and drill logs, and that the foundation ultimately excavated down to “suitable material,” as determined by the Government, was much rougher and more irregular than the drawings, specifications and drill logs portrayed, or than the plaintiff’s thorough prebid site inspection indicated.
*827 (b) It is plaintiff’s contention that the conditions encountered were not only materially different “from those shown on the drawings or indicated in the specifications” (in the language of the Changed Conditions article, supra), but that they also greatly increased his costs by .reducing operating efficiencies, requiring additional equipment, prolonging the performance period, and requiring unplanned performance under severe winter weather conditions, and that the admitted 261 percent overrun of excavation (and corresponding additional fill) paid for at contract unit prices did not properly reflect or compensate for the extreme difficulties and added costs which the subsurface conditions imposed on performance.
(c) In order to place the problem in proper perspective, it is first necessary to examine closely the relevant specifications, drawings, and drill logs to determine what the plaintiff (and other bidders) could have reasonably anticipated in the way of subsurface conditions to be encountered in the course of excavating foundations for the main damsite.
32. Article 2 of the contract, entitled Specifications and Drawings, provided in part as follows:
* * * Anything mentioned in the specifications and not shown on the drawings, or shown on the drawings and not mentioned in the specifications, shall be of like effect as if shown or mentioned in both. In case of difference between drawings and specifications, the specifications shall govern. In any case of discrepancy in the figures, drawings, or specifications, the matter shall be immediately submitted to the contracting officer, without whose decision said discrepancy shall not be adjusted by the contractor, save only at his own risk and expense. * * *
33. Paragraph 16 of the Specifications required that the dam be constructed “in accordance with those specifications and the drawings listed in Paragraph 128 hereof * * Paragraph 128 included Drawing No. 494-D-39, “General Plan and Sections,” which in addition to a general plan drawing of the complete project, contained, inter alia, various detail and section drawings entitled “dam-maximum section,” “profile on center line of cutoff trench-dam,” and “concrete grout cap,” to name a few project features that are *828 relevant to our present inquiry, plus miscellaneous other data as to elevations, camber, reservoir, material legends, dimensional scales, etc. Certain errors and ambiguities in Drawing No. 494-D-39 (hereinafter shortened to Drawing-39), and inconsistencies between the drawing and specifications, constitute the principal basis for plaintiff’s contentions as to Changed Conditions.
34. (a) Drawing 39 contains a profile section drawing entitled “dam-maximum section.” It purports to show a longitudinal cross-section of the main dam perpendicular to the dam axis, meaning a vertical endwise slice of the dam from its upstream toe to its downstream toe. The witnesses were in marked disagreement as to whether the drawing was designed to provide an actual or merely a theoretical cross-sectional location. If the former, they disagreed as to the location depicted. If the latter, the drawing is not labeled as theoretical, and the witnesses’ descriptions were contradictory and confusing.
(b) The drawing is perhaps an adequate diagram as to the relative arrangement of the three “zones” of fill material, the slope angles, reservoir storage levels, and a few dimensions and miscellaneous instructions paraphrased from the specifications, but in other important respects it is misleading, erroneous, self-contradictory, in conflict with another detail drawing contained in Drawing No. 39, and in conflict with Specification 17.
(c) A dimension of 200', plus or minus, is specified for the distance from the crest of the dam to the original ground surface, but this distance is about 214.2' when calculated by use of the 1" to 100' scale beneath the drawing.
(d) Horizontal lines at the bottom of the drawing depict the original ground surface and, below that, the assumed rock surface, which is shown to correspond with the bottom of the cutoff trench, as well as an intermediate undesignated line (whether rock or otherwise is not specifically stated) upon which all of the dam embankment rests, except that part above the cutoff trench. No dimensions are provided as to the space between these surface and subsurface lines, but the maximum scales at 16' between the original ground surface and the bottom of the cutoff trench, the latter being the *829 lowest foundation point. The edges of the cutoff trench are shown to be about 5' lower than the contiguous foundation line.
(e) It cannot be determined from examining the drawing whether the undimensioned spaces separating the surface and subsurface lines are supposed to be actual or theoretical (i.e., diagrammatic), or to be average, minimum, or maximum, or to be any more than a design representation of the 'obvious, i.e., that the original ground surface lies somewhere above the assumed rock surface throughout the main damsite.
35. (a) Drawing 39 also contains a detail drawing entitled “profile on center line of cutoff trench-dam,” which has on either side a 1" to 100' scale from which can be roughly computed the respective elevations of the profile lines representing original ground surface, assumed rock surface, bottom of-cutoff trench, etc. The scale and details are too small for an accurate calculation, but the plaintiff calculated that at 13 equidistant points from end to end of the center line of the cutoff trench, the distance from the original ground surface to the bottom of the cutoff trench is shown to vary from 3' to 13' across the valley, or an average of 6.3'. The Government computed this average to be 7.5'.
(b) Either version of the average, or the plaintiff’s finding of a 13' maximum distance, is substantially less than the 16' difference shown in the “dam-maximum section” drawing described in finding 34, a discrepancy that can only be reconciled either by drafting errors or by the supposition that the 16' difference shown in the latter drawing presumably occurred at some point in the cutoff trench other than the center line shown in the drawing entitled “profile on center line of cutoff trenchdam.” It could also be reconciled by the defendant’s contention that the drawing was merely theoretical and not intended to reflect actual conditions.
36. (a) Article 2 of the contract directed that in the case of difference between the drawings and the specifications, the latter would govern. Paragraph 17 of the Specifications provided that the dam “will have a maximum height of approximately 230 feet above the lowest f oundaton.”
(b) Accordingly, it was reasonable for the plaintiff to conclude, in preparing his bid, that the maximum amount of ex *830 cavation be would encounter at tbe main damsite would be approximately 10', i.e., tbe difference between tbe 230' stated by paragraph 17 of tbe Specifications to be the approximate height of the dam above the lowest foundation (clearly the bottom of the cutoff trench) less the 220' dimension specified in the dam-maximum section drawing to be the distance between the crest of the dam and the original ground surface. A contractor would not normally be charged with knowledge that the latter dimension was in ¡possible error or charged with responsibility to scale the various distances shown in the drawings in order to establish a correct correlation with the Specifications, since the meaning of the drawings in vital respects was ambiguous and indefinite, and these deficiencies would not be immediately apparent to bidders.
37. (a) In addition to the drawings and specifications previously discussed, plaintiff and other bidders had available for examination the logs reflecting the analysis of some 25 test cores, most of which had been drilled in 1939 in order to ascertain subsurface conditions at the damsite. Elsewhere in the project outside the main damsite, other holes and test pits were drilled. Apparently, an unknown number of drill logs were not available for examination.
(b) As admitted 'by ’Government witnesses, there were not enough cores drilled in such a large area as the dam foundation (approximately 22 football fields in size), nor in the proper locations, to provide an adequate estimate of the amount of anticipated excavation, although the Government’s prebid estimates as to excavation quantities were based primarily on conditions of the “assumed rock surface” lines on relevant contract drawings. Bu Bee did not approve its chief designing engineer’s recommendation in 1952 to drill additional cores, which, if done, might have permitted more accurate estimates.
(c) Estimation of excavation quantities from drill log data is inherently inaccurate. Furthermore, the logs did not provide a basis for determining accurately either the depth of excavation before reaching suitable foundation conditions, or for determining the degree of roughness in the underlying rock which plaintiff would encounter in the course of excavating the damsite, particularly in the cutoff trench area *831 of the main dam foundation, where most of the difficulty was encountered. Typically, the logs reported the various stratification of the soils and rocks according to types and depths shown in the contents of each core drill, but from the description given it could not be accurately determined what substances would have to be removed to what depths in reaching suitable foundation conditions, or at what point suitable foundation conditions would be reached, even if the cores had been sufficiently numerous and adjacent to provide a readable and reliable pattern.
(d) The cores themselves were available for examination, but they were not complete and those that existed were badly weathered and decomposed in the course of storage conditions over a protracted period, so an examination of them would not have added substantially to the information available from the log reports. Proof of the inadequacies of the log reports as a basis for predicting subsurface conditions or depths of necessary excavation is evidenced not only by the testimony of Government witnesses but also by the 261 percent variance in the Government’s prebid estimates of quantities of excavation at the damsite. The testimony of witnesses for both parties was overwhelmingly to the effect that there were not nearly enough cores drilled to be helpful, and that very little could be interpreted from the logs as a forecast of excavation quantities, ultimate foundation elevations, regularity or roughness of the ultimate foundation, etc.
(e) The unreliability of the drill logs to predict depth of excavation is demonstrated in Defendant’s Exhibit 58, which plots each of the drill holes in the main damsite and as to each reports the depth of estimated overburden (taken from a Bu Bee study made in July 1951) and the actual depth of excavation which was experienced. In many instances, the estimates were at sharp variance with the experienced depths.
38. (a) Paragraph 55(b) of the Specifications provided that excavation of the dam foundations should be—
* * * to a sufficient depth to remove all materials not suitable for the foundation of the dam * * *, as determined by the contracting officer. The unsuitable materials to be removed shall include all topsoil, rubbish, vegetable matter of every kind including roots, and all *832 other perishable or objectionable materials that might interfere with the proper bonding of the embankments with the foundations, or the proper compaction of the materials in the embankments, or that may be otherwise objectionable. All loose, soft, or disintegrated rock shall be removed to the extent directed by the contracting officer from the abutments of the dam * * * embankments. * * * Cutoff trenches, as shown in the drawings, shall be excavated to suitable rock foundations for the dam * * * embankments. * * *
(b) The suitability of the foundation surfaces depended on the nature of the fill material to be deposited in the particular areas of the dam foundation. For example, in those areas of the excavated foundation surfaces on which Zone 1 material was to be deposited and compacted, it was necessary to remove all overburden down to clean rock surfaces without sands, gravel, silt, muck, ponds of water, or compressible material, particularly in the cutoff trench area. These standards were somewhat relaxed outside the cutoff trench area so as to permit small pockets of silt and sands under Zone 1 fill that were not substantially different from Zone 1 material.
39. Assuming the validity of the plaintiff’s reliance on a Bu Bee representation, drawn from the contract documents, that plaintiff would encounter a maximum excavation at the damsite of approximately 10' to reach suitable foundation conditions, actual excavation experienced at the damsite greatly exceeded this, as shown in cross-section drawings which were maintained by Bu Bee for progress payment purposes and which reflected in great detail the actual excavation quantities and depths at periodic time intervals, as well as the roughness of the foundation terrain.
40. (a) In preparing the bid invitations, Bu Bee estimated a total excavation of 132,955 cu. yd. of overburden under the main damsite to reach suitable foundation conditions. This estimate was based on the removal of an average of 2' of overburden above elevation 4,450' (which presumably would be on the left and right abutments) and 5' below that elevation (which would presumably be the bottom of the dam generally), plus an average of 3' more for the cutoff trench area to get down to bedrock there as specifications required. *833 This estimate contrasts with the representation in the drawings and specifications of a 10' maximum excavation below ground surface, at the lowest part of the foundation, or the approximately 16' depth of the bottom of the cutoff trench shown in the dam-maximum section drawing, which is part of contract Drawing 39.
(b) Plaintiff actually excavated a total of 347,246 cu. yd. for the main dam foundation, an increase of 214,291 cu. yd., or 261 percent, over Bu Bee’s precontract estimate of 132,955 cu. yd. Item 2 of the Schedule provided an estimate of 420,000 cu. yd. of overburden excavation in open cut which was for excavation out of the total 420,000 cu. yd. to the main dam foundation, but from the contract drawings it was possible to make a rough allocation of the 420,000 cu. yd. to the various locations, including the main dam foundation. The overrun in material to refill the dam embankment, which required extraction from borrow sources and transportation to and placement in the dam embankment, was 327,617 cu. yd.
(c) General Condition 4 of the contract advised that the quantities estimated in the Schedule were “approximations for comparing bids, and no claim shall be made against the Government for excess or deficiency therein, actual or relative. * * *”
41. Contract Schedule Items 2, 3, 4, 5, and 6, which comprised generally open-cut excavation wherever it occurred for the dam and dikes, plus excavation for the tunnel, gate chamber, and access shaft, were estimated by Bu Bee prior to the contract invitations in the collective quantity of 753,-840 cu. yd., but performed in the net quantity of 1,002,315.2 cu. yd. for a collective overrun of 248,475.2 cu. yd. (including in the computation an underrun of 19,515 cu. yd. for Schedule Item 3), or an increase of 24.8 percent.
42. Contract Schedule Items 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, and 25, which comprised generally the stripping and excavation of borrow areas and rock sources and transportation of the material to the dam and dike embankments, and backfill and deposit of rock and other fill on the several embankments, were estimated by Bu Bee prior to the contract invitations in the total quantity of 8,376,000 cu. yd., but performed in the net quantity of 8,696,- *834 421 cu. yd., for a net overrun of 320,421 cu. yd. (including in the computation underruns totaling 279,444 cu. yd. for Items 12, 13, 14, 18, 19, 24, and 25), or an increase of 3.7 percent.
43. These statistics, however, must be read with discrimination. By totaling net overruns throughout the project, they fail to reflect the concentration of overruns in the main dam area itself, which is the only area claimed by plaintiff to be responsible for his difficulties. Furthermore, the statistics of excavation quantities fail to reflect the severity of the conditions under which the excavation was performed.
44. Although the cutoff trench below the main damsite was designed to have a maximum width of 150' and a particular configuration both horizontally and vertically, in actual fact the designed shape for the cutoff trench was followed only roughly. Its outlines became amorphous as it became progressively more necessary to excavate the contiguous foundation areas down to rock in order to reach suitable foundation conditions as determined by the contracting officer. Thus, the horizontal outlines of the cutoff trench became indistinguishable from the highly irregular surrounding foundation surfaces, in certain places extending from 300' to 500' in width, as compared with the maximum designed width of 150'. Due to the extreme irregularity of the rock surface that characterized much of the excavated dam foundation, the cavity design disappeared or became indistinct.
45. By February 1,1954, plaintiff had excavated in excess of 119,660 cu. yd. of Item 2 material (excavation overburden in open cut) from the main dam foundation, and by March 2, 1954, had exceeded the Government’s prebid estimate of 420,000 cu. yd. of Item 2 excavated material from all areas of the project. Plaintiff was then ahead of its construction progress plan for excavation.
46. Of the overrun of 214,291 cu. yd. of excavation from the main dam foundation, the Government classified 208,597 cu. yd. (or 97.4 percent) as Item 2 material, the contract price for which was 53 cents per cu. yd., and 5,693 cu. yd. (or 2.6 percent) as Item 3 material at a contract price of $1.20 per cu. yd. Prior to bid, the Government had estimated that *835 10 percent of the total excavation for the main dam foundation would constitute Item 3 material.
47. Paragraph 52 of the Specifications provided in pertinent part as follows:
S2. Classification of excavation. Except as otherwise provided in these specifications, for stripping and common excavation in borrow areas, excavated materials will be classified for payment only as follows:
(a) Excavation, all classes, includes:
(1) Rock excavation. — Rock excavation includes all solid rock in place which cannot be removed until loosened by blasting, barring, or wedging and all boulders or detached pieces of solid rock more than 1 cubic yard in volume. * * *
(2) Common excavation. — 'Common excavation includes all material other than rock excavation 'and overburden excavation * * *.
(b) Excavation overburden. — Excavation, overburden, in opencut will include all common excavation which can be performed without blasting regardless of depth.
* * * On written request of the contractor, made within 20 days after the receipt of any monthly estimate, a statement of the quantities and classifications of excavation between successive stations or in otherwise designated locations included in said estimate will be furnished to the contractor within 10 days after the receipt of such request. The statement will be considered as satisfactory to the contractor unless specific objections thereto, with reasons therefor, are filed with the contracting officer, in writing, within 20 days after receipt of said statement by the contractor or the contractor’s representative on the work. Failure to file such written objections with reasons therefor within said 20 days shall be considered a waiver of all claims based on alleged erroneous estimates of quantities or incorrect classification of materials for the work covered by such statement.
48. Paragraph 55(b) of the Specifications, entitled “Excavation in open-cut,” provided in pertinent part as follows:
(b) Excavation for foundations of dam and dike embankments. — The entire areas to be occupied by the dam and dike embankments or such portions thereof as may be directed by the contracting officer, shall be excavated to a sufficient depth to remove all materials not suitable *836 for the foundation of the dam and dike embankments, as determined by the contracting officer. The unsuitable materials to be removed shall include all topsoil, rubbish, vegetable matter of every kind including roots, and all other perishable or objectionable materials that might interfere with the proper bonding of the embankments with the foundations, or the proper compaction of the materials in the embankments, or that may be otherwise objectionable. All loose, soft, or disintegrated rock shall be removed to the extent directed by the contracting officer from the abutments of the dam and dike embankments. 'Slopes of the abutments shall be reduced to provide satisfactory foundation contours, as shown on the drawings or as directed. Cutoff trenches, as shown on the drawings, shall be excavated to suitable rock foundations for the dam and dike embankments. * * *
49. In January 1953, Bu Bee officials conferred with each other on the question of classification of excavated materials. There was considerable difference of opinion as to the interpretation to be given the language of the specifications classifying excavated materials for payment purposes. The conferees decided that the criterion for classification of excavated materials between “Excavation — all classes” and “Excavation — overburden” was as to whether blasting or its equivalent {i.e., barring and wedging) was necessary. By then, the plaintiff had made verbal protests as to classification of some excavated material, but no written protest.
50. The plaintiff’s first written protest of record regarding the Government’s classification of excavation for pay purposes was dated February 27, 1954, and read in pertinent part as follows:
We are, at this time, protesting the method of classification with reference to contract item No. 3, Excavation, All Classes in open cut. * * * Our interpretation of the contract classification of Excavation, All Classes includes the excavation of both rock and common materials, and the item of Excavation, Overburden includes only all overburden, which item of overburden, we interpret to include unsuitable materials such as top soil, float rock, rubbish, roots and other perishable materials.
í¡{ $ ‡ ^
The specifications provide that Excavation, All Classes, includes both rock excavation and common excavation and therefore the use of explosives is not nec *837 essary to place tbe material into the All Classes classification. The item of Excavation, overburden we interpret to be a surface-stripping excavation only and after the overburden has been excavated the material falls into the All Classes classification of excavation.
51. (a) The plaintiff’s protest of February 27, 1954, remained unanswered for a protracted period. In the meantime, there is no evidence that plaintiff made any formal compliance with the requirements of the concluding paragraph of paragraph 52 of the Specifications as to challenging the monthly estimates of quantities and classifications of excavation.
(b) On October 22, 1954, the plaintiff’s protest of February 27, 1954, was forwarded to Bu Kec by the Government’s construction engineer with a request for a formal opinion as to proper criteria for excavation classification if the criteria agreed upon by the Bu Kec conferees in January 1953 was not to govern. The Government construction engineer’s letter of October 22,1954, to Bu Kec enclosed a proposed letter of reply to Adler, which the construction engineer had prepared but had not sent to plaintiff pending approval by superiors at Bu Kec.
(c) By this time, the construction engineer had discussed the excavation problem with Adler a number of times; and in the meantime, by October 1, 1954, the overrun of excavation at the main damsite had reached approximately 184,-000 cu. yd. (303,140 cu. yd. total excavation at main damsite, less Government prebid estimate of 119,660 eu. yd.). By then, also, Adler had commenced to refill the excavated areas of the main damsite to form the dam embankment, so the physical features of certain areas of the foundation area were covered over and obscured from view, assuming their visibility would have aided in the excavation classification problem, or in the determination of foundation conditions encountered.
52. (a) Having received no reply from his Bu Kec superiors to 'his communication of October 22, 1954, the Government construction engineer wrote again to his Bu Kec superiors on April 26, 1956, enclosing Adler’s protest letter of February 27, 1954, and a proposed reply to it which he had drafted but withheld pending authorization of his superiors to forward it to Adler.
*838 (b) The Government construction engineer’s letter of April 26,1956, to his Bu Bee superiors reviewed the excavation classification problem, reported some intra-Bureau conflicts concerning proper interpretation of the earthwork specifications as to excavation classification, adhered to his earlier view that the proper criterion to distinguish between “all classes” excavation and “overburden” excavation was the necessity for blasting which characterized the former, discussed particid'ar conditions where all-classes material must be blasted to get access to pockets of common excavation requiring removal, and enclosed sketches illustrating typical geological formations presenting this problem.
(c) The letter of April 26,1956, enclosed a proposed reply to Adler’s original inquiry of February 27, 1954, which expressed “regret that reply has been delayed.”
(d) The letter of April 26, 1956, also stated that Adler had made no formal written protest to date but that one was expected, and requested a Bu Bee opinion.
(e) By April 26,1956, the project was nearing completion.
53. In classifying the excavated materials for pay purposes under the specifications, the Government classified and paid for as overburden “The sand, mud and gravels, including loose detached rock of various sizes less than one cubic yard * * Plaintiff considers that such materials should have been classified and paid for as “Excavation — all classes.” Plaintiff also contends that all of the 214,291 cu. yd. of overrun in excavation and in the main dam foundation should have been classified and paid for as “Excavation — all classes.”
54. (a) Plaintiff had an orderly plan for the progressive completion of the project, including sequentially: clearing of the construction and borrow areas, excavation of the diversion and outlet tunnels and of the two dike foundations, installation of grout cap concrete in the dikes, excavation of the vertical shaft for the tunnel, construction of a cofferdam at the downstream toe of the main dam by using some of the burden removed from the main dam area, diversion of the stream after completion of the tunnel and stilling basin, removal of all overburden from the bottom and abutments of the; main damsite, excavation for and placement of grout cap *839 concrete in main damsite, and drilling and grouting of the subfoundation area for the main dam.
(b) As soon as the foundation of the main dam had been completely excavated, including the cutoff trench, and the grout cap and grouting had been completed, it was then planned to commence the placement of fill for the main dam by placing limited amounts of Zone 2 (fine rock fill) and Zone 3 (large rock fill) materials at the downstream toe, and spreading Zone 1 fill material (earth) over the rest of the bottom. The three types of fill for the main dam were to be placed over the entire damsite in successive layers from abutment to abutment, and from toe to toe, so as to provide operating room for the efficient use of the earthmoving and placement equipment.
(c) Thereafter, the remaining concrete structures and roadways would be completed, temporary haul roads would be removed, the area would be generally beautified and landscaped, and the residuals of the contractor’s presence would be removed.
(d) The plaintiff’s progress chart projected removal of all the scheduled 420,000 cu. yd. of overburden by March 31, 1954, and completion of the entire project in 950 days ending: June 25,1955.
55. (a) Plaintiff adhered roughly to its schedule until about February 1954. At the outset, and subsequently as needed, it moved in an adequate supply of equipment in good condition. Equipment and labor forces were deployed at the outset as scheduled. The dikes were started in early 1953 and substantially completed by the end of the 1953 construction season, without encountering any untoward subsurface conditions departing from those anticipated. The stripping excavation operation (i.e., overburden removal) for the main dam foundation was started in mid-1953 in the area of the abutments on either side of the dam and the lower reaches of the bottom area adjacent to both sides of the creek.
(b) By December 20, 1953, the cofferdam was completed with materials removed from the dam foundation, the outlet works and diversion tunnel were completed, and the creek diverted. Thereafter, the river section of the dam area was *840 stripped and excavated and the materials thus obtained were used to complete the cofferdam.
(c) By the end of February 1954, plaintiff had excavated virtually all of the scheduled quantity of Item 2 overburden from the main dam foundation, but had not reached foundation surfaces suitable to the Government. By March 2, 1954, it had excavated the full amount of the Item 2 materials (420,000 cu. yd.) estimated by the Government for the entire project, and, accordingly, was slightly ahead of its own schedule at that time. By this time, the plaintiff encountered the difficult subsurface conditions described elsewhere in these findings, and the Government representatives directed that excavation be continued until suitable foundation conditions were reached.
56. (a) As a result of the subsurface conditions encountered in the excavation of the main dam foundation, the plaintiff’s plans for utilizing his equipment and labor forces were badly disrupted and thrown off schedule. He was forced to perform the foundation excavation and refill in a piecemeal manner and in small areas at a time, instead of the large sections which he had contemplated, thus frustrating the efficient use of his equipment and operating personnel.
(b) In stripping off unsuitable materials and excavating overburden, he encountered numerous projections of solid, irregular rock, which deprived his construction equipment of room to maneuver efficiently in the confined areas dictated by the obstructions. In such areas, his large tractors and highspeed, rubber-tired scrapers could not be used to full advantage because of the abrupt drops and protrusions.
(c) Excavation and refill proceeded on a random, disorganized basis. Much of the excavation had to be performed with small backhoes and by hand, instead of equipment designed for more efficient performance. Quantities of excavated material had to be loaded onto small trucks for removal, and the arrival and departure traffic pattern for these vehicles was forced by the terrain to be circuitous. Instead of being able to place fill in quantity sequence over large areas, it had to be accomplished in small segments as they became available. Material required abnormal rehandling. Bamps had to be constructed to enable vehicles to negotiate precipitate changes in elevations.
*841 (d) In some areas, from 15' to 20' of overburden bad to be removed before hitting the tops of rock formations and dropping into pockets to additional depths of 10' to 15', some of which could not be reached by a %-yard backhoe.
(e) The conditions, as described in the preceding paragraphs of this finding, prevailed over extensive areas of the main dam foundation, and are graphically depicted in a number of photographs which were taken at progressive stages of performance. The depths of excavation are also reflected in the cross-section excavation drawings discussed, supra.
(f) Since approximately 83 percent of all excavation and refill work to be performed in the entire project concerned the main dam itself, any substantial overrun of excavation in the main dam foundation area was critical to the construction progress of the entire project.
57. (a) On December 2,1954, Bu Rec wrote its construction engineer at the worksite, expressing concern that the plaintiff’s revised construction program, because of the heavy overruns in the excavation at the main damsite (with which Bu Rec was familiar because of its increasingly accurate method of reporting excavation quantities), was 4 or 5 months behind the original completion schedule, and recommended that plaintiff be “urged to complete the work at the earliest possible date in order to minimize the assessment of liquidated damages.”
(b) On May 4, 1955, a Government inspector visiting the worksite advised Bu Rec that “arrangements for speeding up his [plaintiff’s] operation should be completed and in operation at present.” After summarizing the work status and the overrun situation, the inspector concluded that “Unless the contractor is able to better organize his work and speed up his operation it will be impossible to complete construction this year.”
(c) On June 15, 1955, the construction engineer at the worksite advised Bu Rec that “We are continuing our advice that he [plaintiff] should accelerate production to complete the fill this calendar year.” He anticipated the work would go into the winter months.
58. On June 22, 1955, the construction engineer at Pactóla, in acknowledging plaintiff’s revised construction *842 program (which, he said was not satisfactory), pointed out that it would be impossible to install any volume of Zone 2 rock fill and rock fines fill on the main dam embankment during the ensuing winter months of freezing weather, because of the specification requirement for wetting the material, and continued:
In order that the Bureau of Beclamation may meet its commitments, which are essential to completion of relocated Highway 85A, reroute of traffic, and start of water storage, it is necessary that the embankment be completed by the end of this calendar year, at the latest. Please review your construction program and equipment needs with a view to increasing production on all lagging features and particularly those rock items which you now indicate will not be completed until March 1956.
59. On October 14, 1955, the construction engineer at Pactóla described to Bu Bee the plaintiff’s arrangements to procure additional equipment and items of additional work remaining to be done during the forthcoming cold weather. The letter further stated as follows:
As you know, for many months we have been urging the contractor to acquire more equipment to expedite completion of his work. I feel that we have exerted every possible influence in that direction. From time to time we have been advised by him of proposed purchases, rental deals, and impending subcontracts, all of which failed to materialize.
60. (a) During the progress of the work, plaintiff called attention of Bu Bee representatives to changed subsurface conditions, which (according to plaintiff) differed from those anticipated by the specifications and contract.
(b) On June 15,1955, plaintiff wrote to Bu Bee requesting a 419-day time extension, consisting of 234 days for overruns in overburden excavation at the main dam foundation and 185 days for a correlative overrun in excavation at Bock Source B needed to fill the main dam embankment. The request for a 419-day time extension was reduced by plaintiff to 329 days by certain offsets which are not relevant to the immediate controversy.
*843 (c) The letter of June 15, 1955, left open the possibility of further time extensions being required before the job was completed; and stated in part as follows:
Our present time for completion of the contract has been set as July 29,1955; therefore it is of the utmost importance and urgency that the time for completing the contract be extended as quickly as possible. We cannot suffer the penalty of liquidated damages on Pactóla Dam Contract, especially when such extensions of time are due to causes beyond our control.
61. Under the date of July 13,1955, the contracting officer issued his findings of fact on plaintiff’s claim of June 15, 1955. He extended the plaintiff’s time for performance by 159 days (as compared to plaintiff’s request for 329 days) due to overruns in excavation and refill. No findings were made as to the changed conditions that had been alleged by plaintiff in its protest of June 15, 1955.
62. (a) On August 17, 1955, plaintiff filed a Notice of Appeal with the Department of the Interior Board of Contract Appeals, and on August 31, 1955, supplemented the notice with a letter which described the details of plaintiff’s objections to the findings of the contracting officer.
(b) On November 17, 1955, the contracting officer withdrew his findings of fact issued July 13,1955, pending further investigation to determine the full extent of the delays.
(c) In a letter to Adler dated November 22,1955, the contracting officer stated as follows:
Because the overrun of quantities cannot be definitely determined until near the end of the job, the supplemental findings will probably not be made until work under the contract is substantially complete. Our release of liquidated damages until the job is complete should not be taken as an indication that the supplemental findings of fact will excuse all of your delay. On the basis of information presently available it appears unlikely that all of your delay will be found to be excusable. Accordingly, you are urged to plan your operations for the winter and for next construction season to complete the work at the earliest possible date and thereby minimize the amount of liquidated damages to be deducted from your final voucher. In the event the supplemental findings do not excuse the entire delay, you can *844 then appeal those findings and secure an administrative review of the entire matter.
63. (a) Although the plaintiff had provided ample equipment for performance of the contract according to its original dimensions, it became apparent, as the substantial overruns in excavation and the difficult foundation conditions materialized, that additional equipment would be required to cope with the situation and to meet the Government’s demands for perforaiance acceleration.
(b) Responding, the plaintiff in 1954 brought in a 2%-cubic-yard Lima power shovel, six new Euclid quarry trucks, another Sheepfoot roller, and another large air compressor. In October 1955, plaintiff added five or six units of high-speed, rubber-tired, earth-moving scrapers and a D-8 dozer push cat, which were brought from Wyoming and other South Dakota locations for digging and hauling, and four units of earthmoving belly-dump wagons imported from a Tiber dam job about 400 miles away from Pactóla.
(c) The rough topography and pocketed work areas in the main dam foundation site prevented efficient utilization of equipment and required more equipment to accomplish less work than under more normal circumstances.
64. Paragraph 9 of the contracting officer’s supplemental findings of fact issued July 11,1956, stated in part as follows:
9. * * * However, the work was seriously curtailed early in November 1955 by severe cold weather and snow. Ordinarily the contractor would have been able to work until the middle of December with very little lost time due to weather. In spite of the severe weather of the 1955-1956 winter, the contractor kept the work going throughout the winter, although at a reduced rate, until warmer weather in April permitted the resumption of full-scale work on the excavation, all classes, items. Because the overruns forced the work to be performed over a longer period, extending over a severe winter season not anticipated when the contract was entered into, the contractor is entitled to an extension of time for any delay occasioned by the winter weather. Excavation, all classes, during the winter was only about 55 percent of the production during warmer weather. Accordingly, it is found that for the 5-month period from November 1955 to March 1956, inclusive, the contractor was de *845 layed 45 percent of the time by a winter season not contemplated by the contract * * *.
65. The winter of 1955-56, from November through March, was unusually severe, particularly the months of November and December, which brought record low temperatures.
66. (a) Pactóla Dam is located in what is sometimes known colloquially as the “banana belt” of South Dakota, which has reference to its usually more moderate climate than the rest of the State. Plaintiff had scheduled its work under the original contract to be carried on as much as possible through the winter months, but did not contemplate working through the 1955-56 winter since the original completion date was June 1955.
(b) At the urging of the 'Government, plaintiff worked under weather conditions in the 1955-56 winter which would ordinarily have caused him to suspend or reduce activities, particularly in November and December 1955. The work he accomplished during this period comprised mainly the drilling and blasting of rock in Pock Source B, loading the material thus blasted by power shovel into trucks and hauling it to the main dam embankment, and dumping the material there in the respective zones.
(c) Working under these conditions decreased the efficiency of plaintiff’s equipment and manpower by causing frequent and serious breakage of equipment components, shovels, caterpillar bulldozers, caterpillar rock rakes, and quarry trucks; interfered with the regular flow of work; caused equipment starting difficulties; and disrupted normal rock drilling, blasting, excavating, transportation, and placement procedures.
(d) The severity of the 1955-56 winter accentuated the difficulties of contract performance which are common to normal winter weather, as in the preceding winters of Adler’s performance at Pactóla.
67. (a) At the outset of a conference held between the parties on July 5 and 6, 1956, to determine the extent of the time extension to be granted and to agree upon extra costs of performance, the Bu Pec representatives proposed to extend the time for performance to April 27, 1956, which would have left plaintiff liable for liquidated damages be *846 yond that date. By the end of the conference, Bu Bee had agreed to extend the time to August 15, 1956, which was satisfactory to plaintiff, in that substantial completion by then was anticipated.
(b) At the conference, the parties discussed plaintiff’s claim that overruns on scheduled quantities of overburden and excavation, all classes, had resulted in additional costs; but after considerable discussion, the Bu Bee representatives concluded that no changes had been made which would account for these overruns. The conferees also agreed upon issuing Order for Changes No. 5 to compensate plaintiff for 11 specified items of changed work in the total sum of $48,814.39.
(c) At the conclusion of the conference, the plaintiff signed the following letter to Bu Bee dated July 6, 1956, prepared by the latter:
Beference is made to conference held with representatives of the Bureau of Beclamation on July 5 and 6, 1956, regarding our claims for extra work and changes in connection with Contract No. 14-06-D-254 for construction of Pactóla Dam under Specifications No. DC-3783, Missouri Biver Basin Project.
This will confirm understanding reached in conference that the payment by the Bureau of Beclamation of the sum of $43,314.39 to us for extras and changes as discussed at the conference will be accepted as settlement in full of all claims for additional compensation under the contract arising out of work performed to date.
Upon the Bureau’s execution of a formal contract document providing for the above payment, all claims for additional compensation presently pending will then be considered as withdrawn without further action by the contractor, and no new claims for additional compensation will be made on the basis of anything occurring prior to July 6,1956.
(d) No reservations were specified in the foregoing release.
(e) The release was signed by plaintiff several days before the granting of a time extension by the contracting officer’s findings of fact dated July 11, 1956, and before the receipt on July 18, 1956, of Order for Changes No. 5 paying plaintiff the sum specified in the release. Adler testified that he was *847 required by Bu Bee to sign the release if he wanted to be paid the sum provided for in Order for Changes No. 5, which was promptly issued thereafter, but this is denied by Government witnesses.
(f) The release by Adler of all excavation and fill claims up to July 6,1956, by payment of $41,618.04 for 5,322 cu. yd. in a relatively small area of the river section of the main dam foundation and $330.77 for excavation in the cutoff trench was inconsistent with the known existence of much more extensive claims for changed conditions and overruns, as reflected in the exceptions reserved by Adler in connection with subsequent releases which he signed.
(g) At the time when Adler signed the release, he did not have access to full Government data as to excavation and fill quantities, because Bu Bee was packing up its records as the completion of the project neared.
68. (a) The figure of $43,314.39 referred to in the release letter of July 6,1956, was the increased cost allowed plaintiff by Order for Changes No. 5, which was dated June 14,1956, but was not received by plaintiff until July 18, 1956. Whether the conference between the parties on July 5 and 6, 1956, which ended with plaintiff signing the release letter, effected any changes in the original contents of the June 14, 1956, Order for Changes No. 5 cannot be determined. From the date sequence, it would appear that at the July 5 and 6 conference, the plaintiff merely approved of or accepted the determinations that had already been made by Bu Bee and incorporated in the June 14 Change Order. Another possible explanation is that the Order for Changes was prepared at the July 5-6 conference but backdated to June 14 for unexplained reasons.
(b) Order for Changes No. 5 provided compensation totaling $43,314.39 for 11 listed changes, of which the first one, accounting for $41,618.04 of the total, read as follows:
In lieu of excavating all classes excavation to provide a reasonably uniform foundation surface in the river bottom area of the dam, you are directed to excavate overburden from crevices, cavities, and channels and refill *848 such, excavation to 1 foot above rock pinnacles with specially compacted Zone 1 material.
This work, which had been actually completed by plaintiff by September 20, 1954, involved 5,322 cu. yd. of additional excavation and fill, at the rate of $7.82 per cu. yd. Of the remaining ten items listed and paid for by Order for Changes No. 5, the second one paid $330.77 for 3,007 cu. yd. of additional excavation in the cutoff trench at $0.11 per cu. yd., and this had been completed in July 1953. The remaining nine items in Order for Changes No. 5 totaled only $1,365.58 (including a deduction item of $103), and involved items of work not related to the main dam foundation.
(c) Under the date of July 30, 1956, Adler executed a statement at the end of the Order for Changes No. 5, certifying that “Adjustment of the amount of compensation due under the contract and/or in the time required for its performance by reason of the changes ordered above is satisfactory and is hereby accepted.”
(d) The Order for Changes No. 5 made no reference to time extensions for the extra work.
(e) All but two of the 11 items covered by Order for Changes No. 5 had been completed by late 1954.
69. (a) On July 11, 1956, the contracting officer issued supplemental findings of fact, which granted plaintiff a time extension of 332 days to August 15, 1956, and described the basis of the allowance in detail. These findings were a final response by the contracting officer to the plaintiff’s letter of June 15, 1955, requesting a time extension, and were a substitute for and enlargement of the contracting officer’s findings of July 13, 1955, Which had been withdrawn on November 17,1955, in an order which suspended the assessment of liquidated damages until the facts could be more accurately determined.
(b) The latest findings of fact increased the time extensions previously granted by means of dividing the total amounts of overrun and fill by figures considered to represent typical daily production by the contractor, based on his performance over a long period. Additional time extensions *849 were based on other factors, including 68 days for delays caused by the severe 1955-56 winter, in which the contracting officer estimated that the contractor could work aIt only 55 percent efficiency.
(c) No mention was made in the July 11, 1956, findings of fact of delay-damage claims by plaintiff, or of the claims referred to in Order for Changes No. 5.
(d) The concluding paragraph of the July 11,1956, findings of fact advised the plaintiff of his appeal rights under the contract. Since the final time extension eliminated the prospect of liquidated damages, disagreement by plaintiff as to the method of computation became moot.
70. On August 15, 1956, the project was accepted by Bu Bee as being substantially complete, although there was a substantial amount of cleanup and beautification to be completed, roads to be eliminated, and debris to be buried. It was fully completed by January 8, 1957, and was considered to be very well constructed, attractive, and watertight.
71. After the substantial completion of the project on August 15,1956, plaintiff performed certain additional work ordered by Order for Changes No. 6 dated July 20, 1956. This work related to raising a road grade, surfacing a parking area, and excavating a ditch on the side of a road through Bock Source B, for which on November 19,1956, he accepted the sum of $5,463.30, as agreed to at a conference between the parties on November 7,1956.
72. (a) On November 20, 1956, Adler executed a release form which provided in part as follows:
Now, Therefore, in consideration of the premises and the payment by the United States to the contractor of the amount due under the contract, to wit, the sum of Two hundred thirteen thousand five hundred sixty-two and 60/100 dollars ($213,562.60), the contractor hereby remises, releases and forever discharges the United States of and from all manner of debts, dues, sum or sums of money, accounts, claims, and demands whatsoever, in law or in equity, under or by virtue of the said contract, except contract items and quantities as listed on the reverse side hereof.
*850 (b) The reverse side of the release summarized exceptions totaling $198,633.20. The numbers and amounts of the exceptions were as follows:

No. Amount

3 _ $22, 832.40
4_ 1,342.00
11_ 41,532.87
12_ 33,407.79
14_ 23,600.50
16_ 68,429.70
21_ 1,463.00
41_ 688.60
43_ 2, 772.00
50_ 770.00
51_ 572.00
52_ 463.20
OFC No. (3) (c) 759.24
73. The $213,562.60 «given as the consideration for the release of November 20,1956, consisted almost entirely ($212,-319) of retained percentages, i.e., 10 percent of all the contractor’s monthly earnings were to be retained until he had completed 50 percent of the work (in this case through August 1954), and were to be paid to the contractor upon completion and acceptance of the project and presentation by him of a certified voucher «and, if required, an executed release, all as provided by Article 16 of the contract.
74. (a) By a letter dated November 20, 1956, plaintiff returned his release of that date, together with public voucher, labor standards certification, and executed Order for Changes No. 6, to Bu Bee.
(b) The letter of November 20, 1956, stated in part as follows:
The “Release on Contract,” Form 7-292, has been properly executed by us with thirteen items of exceptions set forth on the release of contract. The exceptions indicated on the release are «pursuant to Article 16 of the contract. During our conference in Denver with the various representatives of the 'Government on November 7, 1956, the officials were «advised that exceptions would be set forth in the release on contract, «and we also agreed that claims in connection with the exceptions to the release on contract, would be filed immediately. It is our desire to immediately review the government calculations and figures in connection with the contract items excepted in the release, which review may require about fifteen to twenty days, whereupon we will process our *851 claims for all discrepancies discovered. We anticipate processing and filing of our claim or claims on or before March 1,1957. We anticipate reviewing the government records immediately and before such records are transferred to the District Office at Huron, South Dakota.
75. On November 30, 1956, plaintiff received final payment under the contract in the amount of $213,582.60.
76. On August 23,1957, Bu Bee wrote the following letter to plaintiff:
In your letter of November 20, 1956, accompanying the release on contract, you stated that additional data on your claims excepted from the release on contract would be filed on or before March 1,1957. Since that time I have heard nothing further from you regarding these claims.
In order that we may close our files on this job, I propose to issue findings of fact in approximately 60 days using such information as we have on your claims if the additional data is not filed by that time.
77. On October 17, 1957, plaintiff wrote as follows to Bu Bee:
Your letter dated August 23, 1957 and addressed to our Bapid City, South Dakota office has been forwarded to our new Englewood, Colorado office.
The checking of the project office figures to prepare our claim for additional compensation in connection with Pactóla Dam, Specifications No. DC-3783, is requiring considerably more time than was originally anticipated. We have discussed the several items within our claim with your office, verbally on three or four occasions since February 1957.
Some of the items of work in question may require assistance from your office and/or engineering assistance because the government project records are not too clear in several instances.
It is our desire to personally discuss some of the records and our findings with your office prior to the submission of our claim on several of the items of work involved; therefore we will greatly appreciate your delaying the issuance of Findings of Fact until the matters can be discussed with you.
78. On February 7, 1958, Bu Bee issued findings of fact and a decision by the contracting officer, which read in part as follows:
*852 2. In executing tbe release on contract dated November 20, 1956, tbe contractor excepted 13 items of claim totaling $198,633.20. * * *
3. Having beard nothing further from the contractor on this matter in the meantime, the Government wrote to the contractor on August 23,1957, advising that findings of fact would be issued in 60 days using the information then available. On October 17, 1957, the contractor replied to that letter, requesting that issuance of the findings of fact be delayed until details of his claims could be discussed. Accordingly, a meeting was held on November 5, 1957. The discussions held then were inconclusive because the contractor had not completed his data required for detailed study of his exceptions. At the meeting, he did agree that his review of the Government calculations would be completed by the end of November 1957, and that he then would contact the Bureau to arrange an immediate meeting for discussion in detail of his exceptions to the release. To the date of these findings, the contractor has not contacted the Bureau further in regard to his claims, nor has he furnished any additional information. * * *
4. As a result of the contractor’s exceptions to the release on contract, the Government has reviewed the computations and has discovered an error in the quantity paid under Item 50, Concrete in Dam Embankment Cutoff Wall and Outlet Works Stilling Basin Walls. The quantity paid on the final estimate under this item was 827.8 cubic yards, whereas the quantity should have been 9.65 cubic yards larger. This quantity of concrete had been placed in the cutoff wall during 1954, and later computations overlooked this 9.65 cubic yards. At the bid price of $55.00 per cubic yard, the contractor is entitled to $530.75 additional payment for Item 50.
5. The computations for all other items listed by the contractor as exceptions to the release on contract have been carefully cheeked and no discrepancies have been found. Accordingly, it is the conclusion of the contracting officer that all of the contractor’s claims except that on Item 50, are without a proper basis in fact, and they are hereby denied.
79. On March 3,1958, plaintiff filed a notice of appeal to the findings of February 7,1958, and said, inter alia:
The Findings are not complete in that they do not give consideration to the extra costs incurred by reason of the overruns in Items 2, 4, 9,11, 16, 17, 20, 21, 23, 40, 41, 42, 43, and 44 through 52 inclusive. The total of *853 the additional quantities extended the performance of the contract beyond the period foreseeable at the date of execution. Such quantity increases indicate that the subsurface or latent conditions at the site differed materially from those anticipated by information furnished by the Contracting Officer.
80. No such claim was excepted from the operation of the release given by plaintiff on November 20,1956. Of the items mentioned by plaintiff in its notice of appeal, nothing in the release excepted any claim in connection with Items 2 (Excavation, overburden), 9,17, 20, 23, 40, 42, or 44 through 49. Furthermore, as to items excepted from the operation of the release the only exception was as to the accuracy of the quantities for which plaintiff had been paid. There was in the release no reservation of a claim for extra costs by reason of overruns or because of any extended performance period. In its appeal, plaintiff did not cite any claim as to Item 3 (Excavation, all classes, in open cut), or any claim as to misclassification of excavation.
81. A letter dated March 20,1958, from Bu Kec to plaintiff stated in part as follows:
A brief study of your appeal indicates your desire to review the project records and set forth in detail the points of alleged error on which you are basing your claims. It is agreed that any areas of alleged error should be delineated so that the hearings may be as brief and effective as possible.
*****
It has been the desire and -intention of the Bureau to meet with you and aid in every way to check, specifically, points of disagreement. If you wish assistance and a cooperative review of the calculations, will you please communicate with this office to arrange a meeting for that purpose in the immediate future. Assistance will be readily available until about May 1, 1958, except for the week of March 30 to April 5.
In the event that any errors in the calculations are discovered by our mutual efforts, in the period allowed by the Board of Contract Appeals for your filing of a brief, the findings will be revised, or reissued, to reflect any corrections that may be found to be justified.
82. (a) Pursuant to the Government’s invitation, as noted in finding 81, Adler, accompanied by an engineer employed *854 by him, one Thomas Zolper, arrived at the Bureau’s offices in Denver on Tuesday, April 15, 1958. Thereafter, for the balance of the workweek, conferences were held between Adler and the Bureau engineers; and measurements were made by Adler, Zolper, and the construction engineer, Goehring, from the project construction records.
(b) All of the contract items cited in the exceptions to plaintiff’s release of November 20, 1956, were studied; and there were no errors found in the Government’s measurements as to Contract Items 3 (Excavation, All Classes, in Open Cut), 12, 13, 41 and Order for Changes No. 3, and those items were deleted from plaintiff’s claims.
(c) The construction engineer, in a memorandum of the conference written May 1, 1958, said that he believed plaintiff’s claim under Contract Item 51 had been similarly deleted ; and no claim under that item is prosecuted here.
(d) It is not entirely clear from the contemporaneous memorandum, but it is reasonable to infer that plaintiff did not object to the deletion of his claims for Items 3, 12, 14, 41, and 51, and under Order for Changes No. 3, seemingly convinced by the Government’s proof.
83. Errors in the Government’s quantity measurements were found by the conferees in Items 11 and 16, as well as in Item 50, the error in which had previously been corrected by the findings of fact dated February 7, 1958. In Item 11, an arithmetical error had resulted in payment to Adler for some 13,719.2 cubic yards less than actually excavated, entitling him to a further payment of $5,076.10 for that item. A similar error in Item 16 of 3,863.1 cubic yards entitled Adler to a further payment of $3,476.79.
84. Disposition of certain claims in the fashion indicated in findings 82 and 83 left only four of the exceptions to Adler’s release as to which no agreement had been reached at the end of the conference. These were Adler’s exceptions to Items 4 (Excavation, All Classes for cutoff wall footings, grout caps and cutoffs), 21 (Special compaction of earthfill), 43 (concrete in cutoff wall footings and group caps), and 52 (concrete in highway pavements).
85. Following the 4-day conference described in findings 82-84, Government engineers thought that Adler’s claims on *855 the four items not resolved (i.e., 4, 21, 43, and 52) might have some merit; and the “records and computations were studied again with a view to finding justifiable reasons and quantities for payment.”
86. As a result, the Bureau decided to allow Adler 46.6 more cu. yd. on Item 4 than he had been paid for. At the time of the conference, Adler was seeking payment for only 43.3 cu. yd. on Item 4, which, at $22 per yard, came to $952.50. The Bureau’s allowance was somewhat larger, $1,025.20.
87. Adler’s claim for special compaction of earthfill, in the amount of 418 cu. yd., was allowed in full in the amount of $1,463.
88. Adler, who in his release and at the conference, claimed he was entitled to payment for an additional 115.5 cu. yd. of grout cap concrete (Item 43), claimed only an additional 43.3 cu. yd. of grout cap excavation. The engineers were unable to see how Adler could claim so much more concrete fill than he had excavation. Study of batch counts led to an allowance of 48.1 additional cu. yd. of concrete to fill the void left by the extra excavation allowed (46.6 cu. yd., see finding 86) ; and in addition the Bureau found that another 37.5 cu. yd. had not been paid for. This led to an allowance on Item 43 of 85.6 additional cu. yd., warranting payment of an additional $2,054.40.
89. Adler’s exception on the release of 19.3 additional cu. yd. of “concrete in highway pavement” (Item 52) was allowed in full.
90. Under the date of November 14,1958 (but not mailed to plaintiff until January 29, 1959), the contracting officer issued supplementary findings of fact, which discussed plaintiff’s exceptions to its release and stated in part as follows:
9. As a result of the review of the data, no errors or irregularities were found in the calculations for final payment for Items 3, 12, 14, 41, 51 and Order Changes No. 3.
10. In his notice of appeal, dated March 3, 1958, the contractor requested an adjustment because the large overruns in several of the major items of the job forced the work to continue for a longer period than had been originally planned. * * * The release on contract * * * did not reserve such a claim. The contractor’s failure to except this claim from the operation of the release on con *856 tract precludes my considering the claim, and it is therefore denied.
11. In summary, it is found that the contractor is entitled to the following additional compensation on Items 4,11,16, 21, 43, and 52 of the schedule of Specifications No. DC-3783 * * * [$1,025.20 on Item 4, $5,076.03 on Item 11, $3,476.70 on Item 16, $1,463 on Item 21, $2,054.40 on Item 43, and $463.20 on Item 52].
The Findings of Fact dated February 7,1958, showed that the contractor was entitled to $530.75 under Item 50 of the schedule of the specifications. Thus, it is found that the contractor is entitled to a total of $14,089.28 additional compensation. All other exceptions to the release on contract are found to be without proper basis and they are denied.
91. On January 30, 1959, plaintiff wrote the following letter to Bu Bee:
We hereby acknowledge receipt of your letter dated January 29,1959, in which you transmitted the Supplemental Findings of Fact and Decision dated November 14,1958, in connection with the above named contract.
Please be advised that we hereby accept said Supplemental Findings of Fact as satisfactory settlement of all claims under the afore-mentioned contract except as follows:
We reserve all the rights in connection with our claim as outlined in Paragraph IY of our Notice of Appeal dated March 3,1958, in which we claimed additional compensation for increased costs on the items stated therein, because these additional quantities extended the performance of the contract beyond the period foreseeable at the date of its execution.
Accordingly, we do not accept Paragraph 19 of the afore-mentioned Supplementary Findings of Fact and Decision dated November 14, 1958, and a formal Notice of Appeal therefrom will be filed at a later date.
92. Subsequently, on February 28, 1959, plaintiff filed a timely appeal with the Interior Department’s Board of Contract Appeals. On January 4, 1960, in IBCA-156, the Board sustained the Government counsel’s contested motion to dismiss the appeal on the ground that the claims presented by Adler “sound either in misrepresentation or call for recovery of unliquidated damages,” over which the Board had no jurisdiction.
*857 93. The various matters pertaining to this case were first brought to the attention of the Congress in an earlier document entitled “Statement as to Case of Adler Construction Company,” dated February 12,1960. Adler’s claims made in that statement were, briefly stated, that the Government had:
(a) Failed to fully rectify a mistake in bid by Adler, depriving Adler of $136,240;
(b) Failed to allow equitable adjustment for excess costs arising from changed or latent conditions at the site and gross overruns of quantities; and
(c) Failed to allow excess costs and damages from breaches of contract by the Government.
94. During the 86th Congress, 2d Session, there was introduced a bill identified as S. 3199, dated March 14, 1960, for the relief of Adler Construction Company. Later, the bill was referred to the Court of Claims by S. Res. 288.
95. Following the reference of S. 3199 to the Court of Claims in August 1960, the matter was docketed as No. Cong. 10-60, and the court accepted reference of all three claims. However, as a result of the Supreme Court’s opinion in Glidden Co. v. Zdanok, 370 U.S. 530 (1962), the Court of Claims issued an order dismissing the congressional reference aspect of plaintiff’s claims but retaining jurisdiction of plaintiff’s breach of contract claims as being within the court’s general jurisdiction pursuant to 28 U.S.C. §1492 (1958 ed.).
96. On April 17, 1970, the court issued its opinion in this case, dismissing plaintiff’s petition on the ground that, from a legal standpoint, plaintiff had effectively “released” the Government from liability for any reimbursement claims it might have had, [191 Ct. Cl. 607, 423 F. 2d 1362 (1970), cert. denied, 400 U.S. 993 (1971)].
97. In view of the long pendency of this controversy, and the fact that an extensive trial had already been held on this matter prior to the filing of plaintiff’s present petition, and, further, in order to obviate the need for further proceedings, plaintiff proposed that an agreement be reached by the parties on the conclusion to be reported to the Congress. After extensive negotiations by counsel, the parties have reached agreement that plaintiff has no valid legal claim against the United States, but that it has a valid equitable claim in the *858 total amount of $300,000. This equity settlement amount is designed: to reimburse plaintiff fully for the remaining $138,532.86 relating to alleged mistakes which plaintiff made in the preparation of its bid for the project; and to compromise for $163,467.14, as an equitable amount, all remaining claims, including but not limited to claims for changed conditions, breaches of contract, and anticipated profits.
CONCLUSIONS
1. The plaintiff, Adler Construction Company, a partnership composed of Harold C. Adler and Vera L. Adler, does not have any legal claim against the United States.
2. Under the standards set out in Burkhardt v. United States, 113 Ct. Cl. 658, 84 F. Supp. 553 (1949), the plaintiff does have a valid equitable claim against the United States.
3. The amount of $300,000 is equitably due from the United States to the claimant.