OPINION**
Bv The Review Panel: The United States Senate, by S. Res. 20, 91st Cong., 2d Sess., referred S. 266 to the Chief Commissioner of the U.S. Court of Claims, a Bill “for the relief of the O’Brien Dieselectric Corporation” pursuant to 28 U.S.C. §§ 1492 and 2509 (Supp. V, 1965-69). The Chief Commissioner referred the case to Trial Commissioner C. Murray Bernhardt for proceedings in accordance with the Rules, and designated the named members of the Review Panel to consider the Trial Commissioner’s opinion.
Following a trial, Commissioner Bernhardt, in an opinion filed September 19,1972, concluded:
* * * [T]hat the general release given by plaintiff embraced all manner of plaintiff’s claims under consideration in 1960 and now, whether legal or equitable, and not just claims of a legal nature. The matter is mooted, of course, by the earlier conclusion that the claims presented in 1960 and now were all of a “legal” nature, and that no merits have been established deserving equitable consideration.
Order of the Review Panel, following oral argument on plaintiff’s exceptions to the Trial Commissioner’s opinion, *905 reopened proof as to damages and remanded the case to the Trial Commissioner for findings on delay-costs attributable to:
a. The specification of heaters “similar and equal to Superfex Model 480 series as manufactured by Perfection Stove Co.” (Finding 16)
b. The fact that there “was no other type of heater available from .other manufacturers that was equal to the Perfection model referred to * * (Finding 16)
c. The fact that “[djemand for the heater, of which Perfection was the sole source of supply, was heavy due to contemporaneous orders under other Government contracts” (finding 16), and consequent delays due to the allocations and priorities system then in effect because of the Korean conflict. [1]
After another trial, Commissioner Bernhardt, in a second opinion filed December 19, 1974, made additional findings and concluded that:
* * * [T]he plaintiff has not estabalished that it was effectively delayed by the heater problem. * * * This conclusion, which was implicit in the earlier liability opinion and findings, is independent of the release defense upon which the Trial Commissioner’s previous rejection of the claim was primarily predicated. * * *
This opinion follows the filing of plaintiff’s exceptions to the Trial Commissioner’s second opinion of December 19, 1974, and oral argument thereon. While the Beview Panel agrees generally with the ultimate conclusion of the Trial Commissioner, it deems it appropriate to state its opinion and conclusions somewhat differently. In doing so, we have borrowed heavily from Commissioner Bernhardt’s opinion and findings of fact.

The Release Issue

The Bill (S. 266), which S. Bes. 20 referred to the Chief Commissioner, directs payment to plaintiff of $192,000 “in full satisfaction of all claims * * * against the United States for reimbursement for losses incurred under” three contracts awarded plaintiff in June 1951 by the United States, such *906 losses having occurred as the result of a delay by the United States in issuing a modification order to one of the contracts, the failure of certain other companies [plaintiff’s suppliers] recommended or designated by the United States, to provide certain items and test equipment necessary to the performance of such contracts, and other unforeseeable circumstances * *
Defendant’s answer herein is responsive to a petition detailing the allegations of plaintiff’s claim for legal or equitable relief. The answer does not, however, plead release as an affirmative defense. Moreover, Senate Deport No. 91-1309 accompanying S. Res. 20 observes that:
The Department of Justice opposes the enactment of S. 1090 [a prior and similar bill] for the reason that claimant should be barred from further relief because of the settlement made by it and the Government in the suit tried in the Court of Claims..
For reasons before and hereinafter stated, the committee does not feel that the settlement made by claimant and the Government in the Court of Claims bars relief.
The fact that a judgment is entered on the release and paid by the United States is argued to constitute res judicata but that situation has been before the U.S. Court of Claims many times, and the court has, without hesitation, recommended the granting of equitable relief by Congress despite prior judgment on the merits [citing-cases] .
* * * * *
The committee is of the view that the settlement entered into by claimant and the Government in the Court of Claims was only a settlement of the legal claims based on breach of contract and was not a settlement of the moral and equitable claims of claimant, such as they may be.
The authorities hold that a settlement or release in such circumstances does not bar congressional relief based on equitable considerations. [Citmg cases.]
*****
Favorable action on this resolution would be in accordance with established precedents, as noted above.
The foregoing notwithstanding, testimony was taken at the first trial regarding earlier litigation, and its possible *907 bearing as a release of this Congressional Eeference case seeking equitable relief.
As is not uncommon, this petition for equitable relief was preceded by prior unsuccessful attempts to secure relief within the contracting agency, and thereafter in a conventional suit for breach of contract in this court. Plaintiff, in November 1953, first sought an increase in contract price on the equitable grounds set forth in Title II of the First War Powers Act of 1941.[2] The claim was turned down in August 1954. It then filed claims with the agency on legal grounds, pursuant to the “Disputes” clause contained in each contract. They were denied by the contracting officer and, in April 1957, by the Armed Services Board of Contract Appeals representing the Secretary of the Army.
Prior to that board decision plaintiff, on May 23, 1956, filed a petition in this court alleging breach of contract. During pendency of that action for damages in the amomit of $225,000, it offered to settle certain of the claims for $37,000 and to waive the remainder. Defendant counteroffered to settle the case for $7,500. As a result of settlement negotiations, on July 25, 1960, during trial, the parties agreed to settle for $8,250 and a stipulation to that effect was filed August 30, 1960. The stipulation recited that plaintiff had agreed to accept that sum in full settlement of all claims set forth in the petition, and that it supported a judgment in that amount to plaintiff.
At the first trial of this Congressional Eeference case, and notwithstanding the above-quoted Senate Eeport and the absence of a release defense in the answer to the petition, the issue of release was raised. Mr. O’Brien of plaintiff company testified that while the breach of contract trial was suspended for settlement negotiations on July 25, 1960, the Trial Commissioner had stated to him from the bench that most of the allegations in plaintiff’s petition were not within the court’s jurisdiction; and that later off the bench the Trial Commissioner had explained that most of plaintiff’s claims belonged in a court of equity.
Counsel, who were out of the courtroom at the time, have differing versions of their intent in settling the breach of *908 contract action. Plaintiff’s counsel stated be bad intended to settle only those claims set forth in paragraphs 7 through 9 of that petition, and 'believed that the balance of the claims were beyond the court’s regular jurisdiction; that the only remedy was via a Congressional Reference as in the instant proceeding. Defendant’s counsel stated that at the 1960 settlement conference, plaintiff’s counsel wanted to settle the whole case because he thought it weak, and defendant’s counsel thought that the $8,250 he recommended applied to settlement of the entire claim, and not merely elements of it.
■ In any event, it is obvious that this reference by the Senate does not evidence an intent that we go off on that issue. The Bill, the Senate Resolution and the Senate Report, in fact, evidence a contrary intent. A significant number of Congressional Reference cases are referred by the Congress for the very reason that a release, or the running of the statute of limitations, otherwise constitute a bar to consideration of the case at law and on its merits.
The cases cited and discussed in the Senate Report are typical, and support that conclusion. So also does Adler Constr. Co. v. United States, 199 Ct. Cl. 809 (1972).[3] It is therefore not deemed appropriate nor necessary to enter upon the threshold issue of the release as raised at trial, nor to resolve the conflict in the understanding of the parties as above-summarized.

The Issues on the Merits

In the spring of 1951, Mr. O’Brien, President of O’Brien Machinery Company of Philadelphia, in business since 1915, learned that the Philadelphia District of the Army Corps of Engineers was planning to buy 600 portable, diesel-driven electric generator sets urgently needed by the Air Force for use in Korea. Each set was to consist of a diesel engine, a generator, a control panel, heaters with winterized accessories, a skid base, and a weather resistant housing. A purchasing agent for the District, Mr. Buchanan (since de *909 ceased) advised that the sets were of a standard type except that they were to be “winterized” by means of heaters and heat ducts to permit startup and operation at a minimum temperature of -65° F. In this respect they were somewhat, but not unduly, novel.
Testing facilities for the winterization features were scarce. Mr. Buchanan further advised Mr. O’Brien that the Perfection Stove Company could provide heaters of the type required, as well as design and furnish winterizing accessories and ducts for the heaters, tailored to the particular requirements of the generator set, for about $325 per set plus a modest development cost. Mr. Buchanan a] so told Mr. O’Brien that the engine to be used for the generator set would require approval by the Corps of Engineers at Fort Belvoir, and that General Motors had been soliciting the District to use their Series 71 engine, which they said was immediately available. As a purchasing agent, Mr. Buchanan had only limited authority to 'make representations which would be binding on the contracting officer.
In April 1951, O’Brien Machinery Company joined with Electric Machinery Manufacturing Company (a manufacturer of electric generators) to form plaintiff corporation and bid on the forthcoming procurement. Factory space was leased by plaintiff from O’Brien Machinery Company. Bids were invited in June 1951 for the 600 sets. After soliciting prices and delivery data from various suppliers, including a General Motors distributor of diesel engines (Frantz Equipment Company), plaintiff submitted a bid on June 16, 1951. Plaintiff had not previously contacted Perfection Stove Company to corroborate the other information furnished by Mr. Buchanan as to the heaters and winterizing kits.
The specifications called for heaters “similar and equal to Superfex Model 480 series as manufactured by Perfection Stove Co.” The “similar and equal” language was meaningless since the Government concedes that there was no other type of heater equal to the one specified. Perfection was the sole source of supply, and demand for the heater was heavy due to contemporaneous orders under other Government contracts. Specifications for the winterization accessories other than heaters were of the “performance” rather than of the *910 “design.” type.[4] No drawings were provided by the Government, that being an obligation of the contractor.
Mr. O’Brien’s testimony on whether he examined the specifications prior to bidding is inconclusive. Plaintiff understood the winterization aspect to be somewhat novel, and it planned to subcontract all of the separate components of the generator sets, thereafter assembling and testing the required pilot model and production units with its own work force. O’Brien Machinery Company had theretofore built conventional generator sets, but not under Government contract, and without winterization features.
Although plaintiff’s was the lowest of six bids, it and three other bidders were subsequently advised that the 600 units would not be awarded to the low bidder but that four separate contracts would be negotiated with four selected bidders for 150 units each. On June 26, 1951, plaintiff received contract DA 36-109-ENG-957 (hereinafter contract 957) for 150 skid-mounted diesel-driven portable electric generator sets, for delivery by April 1,1952. On June 27 and 28, 1951, plaintiff was also awarded contract DA 36-109-ENG-961 (hereinafter 961) for 40 skid-mounted portable generator sets driven by gasoline engine; and contract DA 36-109-ENG-1052 (hereinafter 1052) for four trailer-mounted, gasoline-driven generator sets. None of these three contracts contains a provision permitting the agency to afford administrative monetary redress for Government-caused delays. The standard “Changes” clause contained in each contract authorizes an equitable adjustment of contract price and performance time for changes in the specifications and drawings ordered by the contracting officer; and the standard “Default” provision relieves the contractor from responsibility for delays which are beyond its control and without its fault or negligence.
By reason of difficulties hereinafter described, deliveries under contract 957 (for 150 diesel-driven generator sets scheduled for completion April 1,1952) actually began May 15, 1953, and were completed August 21, 1953. Under con *911 tract 961 (40 gasoline-driven units scheduled for completion December 15, 1951) deliveries actually began December 19, 1952, and were completed January 23, 1953. The four gasoline-driven units under contract 1052, scheduled for completion November 30, 1951, were actually delivered January 20, 1953. Plaintiff was afforded time extensions, but not monetary relief, for the delays which were deemed beyond its control and without its fault or negligence.
Plaintiff was adequately staffed and equipped to perform these contracts, and the units it produced and delivered were considered superior in quality. The other three contractors mentioned earlier also encountered severe difficulties in varying degree. (See, for example, Bolinders Co. v. United States, 139 Ct. Cl. 677, 153 F.Supp. 381 (1957), cert. denied, 355 U.S. 953 (1958).) There then followed plaintiff’s unsuccessful application for equitable and then legal relief before the Army, and plaintiff’s suit for breach of contract and this application for relief by Congressional Reference, as earlier described.
A. The Diesel Engines
The petition adverts to certain alleged misrepresentations by the Government as to the diesel engines required for the 150 generator sets under contract 957. Upon receiving that contract, plaintiff conferred with the General Motors distributor (Frantz Equipment Company) regarding the GM diesel engine earlier mentioned by Mr. Buchanan as being suitable. The contract did not specify any particular engine.
On July 6, 1951, Frantz offered to supply 150 GM diesel engines but warned that it could not guarantee that the engine would comply with the design and performance requirements of the specifications, and that it would not accept responsibility for noncompliance. Frantz offered to start deliveries August 8, 1951, with one engine for plaintiff’s pilot model, and to complete deliveries in February 1952. Because of uncertainty as to whether the GM engine conformed to the specifications, plaintiff, on August 7,1951, ordered 151 diesel engines from International Harvester Company. The first *912 Harvester engine was delivered January 25, 1952, and was incorporated in a pilot model generator set assembled for testing by February 25,1952. Another Harvester engine was shipped to plaintiff on March 17,1952.
Thereafter, no more engines were shipped to plaintiff by Harvester until November 25,1952. In the interim (March 17 to November 25,1952), Harvester had plaintiff’s pilot model generator set in its possession for testing during the period April 28 to June 5,1952. Certain- deficiencies had developed in the engine, including the governor mechanism. Although plaintiff contends that those deficiencies were attributable to a strike at Harvester’s plant from July 8 to November 15, 1952, during which engine pumps were said to have been left on the shelf too long, those difficulties with the engine were experienced prior to the beginning of the strike.
As later detailed, the engine was then sent to Hill Diesel Company for altitude testing, and to Perfection Stove Company on July 10, 1952, for cold testing and fabrication of winterization equipment. These factors, plus the Harvester strike, account for the delay in shipments of Harvester diesel engines from March 17 to November 25, 1952. Shipments were completed on July 31, 1953. None of these factors contributing to delay in receipt of diesel engines for contract 957, are attributable to Government action or inaction.
Mr. Buchanan’s precontract comments with respect to the GM diesel engine did not amount to an actionable misrepresentation that the engine mentioned would meet the specifications. Moreover, he was not authorized to speak for the contracting officer. There is no evidence of any independent investigation of the suitability of the GM engine by plaintiff, prior to bidding. The data acquired from the GM distributor related only to price and delivery. Even if deemed, arguendo, to be a misrepresentation, the total delay attributed to Mr. Buchanan’s statements would not' exceed 1 month, starting July 6,1951, when plaintiff learned the GM engine could not be warranted for compliance, and ending August 7, 1951, when plaintiff placed its order with Harvester. In summary, the truly significant delays in procuring diesel engines suffered by plaintiff grew out of its subcon *913 tract with. Harvester, and were not chargeable to Government action or omission.[5]
B. The Heaters and Winterization Kits
Plaintiff 'also attributes delay to Perfection Stove Company in supplying it with heaters and winterization kits. This claim is similarly confined to contract 957 for the 150 diesel-driven sets.[6] As previously mentioned, the specifications were explicit as to the heater, requiring Superfex Model Series 480 made 'by Perfection Stove Company, which was the sole source of supply for this item. Perfection was loaded down with contemporaneous orders under other Government contracts.
It .was August 22, 1951, about 2 months after it received award of contract 957, that plaintiff issued purchase orders to Perfection to design, develop and furnish 150 winterization kits. The cost was not to exceed $4,000 each, including testing. Perfection estimated that after it received a pilot model of the diesel generator set it would take 1 month to develop a winterization Ht, 'another month to complete drawings and specifications, and 6 weeks thereafter to begin deliveries.
Plaintiff shipped a pilot model of the gasoline generator set to Perfection on March 7,1952, and promised to ship the pilot model for the diesel generator shortly thereafter. However, the diesel pilot model was not received by Perfection until July 15, 1952. It could not design the winterization kit until it had in its possession a pilot model which had itself previously passed the altitude ¡test and a cold test. Plaintiff had sent its pilot model to Hill Diesel for altitude testing on June 5, 1952, but defects in the diesel engine, as previously described, frustrated completion of the altitude test, thereby deferring delivery to Perfection until July 15,1952.
Perfection had first to perform cold room tests on the *914 pilot model before winterization kits conld be produced in quantity, and Perfection was not equipped to carry out all the required cold room tests. Due at least in part to additional problems encountered with the diesel engine and electrical system, the cold room test on the pilot model was not completed until September 5,1952.
At that time it was first discovered that a Series 590 heater, rather than the Series 480 specified in the contract, would be required. The Series 590 cost an additional $163 per heater.[7] Perfection provided plaintiff with sketches for the winterization kits (for both diesel and gasoline generators) October 1, 1952. On October 24, 1952, plaintiff cancelled its purchase order to Perfection for the 150 winterization kits for the diesel generators under contract 957 and decided to fabricate the kits itself, using Perfection Series 590 heaters, and certain accessories still to be provided by Perfection.
Accordingly, plaintiff issued a new purchase order to Perfection December 9, 1952, for the items it needed to proceed with winterization kits, namely, 150 of the Series 590 heaters, battery temperature controls and oil sump thermostats. It paid Perfection a cancellation charge on the first order. Delivery was now promised in 4 to 6 months, due to the priority of orders under other contracts including Air Force contracts. Prior to cancellation on October 24, 1952, of the first order for the complete winterization kits, Perfection had been obligated to deliver within 18 to 20 weeks after receipt of that original order.
By early January 1953, the District was threatening default termination of the diesel generator contract, originally scheduled for completion April 1, 1952. As a result plaintiff was putting pressure on Perfection to deliver the required heaters and accessories. They were delivered between January 26 and May 29,1953, the bulk of them on March 18 and April 10,1953. This was within the 4 to 6-month period promised .by Perfection with the second purchase order.
Plaintiff had proceeded to fabricate its own winterization kits (without heaters and accessories) on December 10,1952. *915 There is no direct evidence as to when plaintiff had reached a point of completion where it was waiting for heaters and accessories from Perfection to assemble them into complete generator units. Generally, the shipment to the Government of complete generator units followed receipt of heaters from Perfection by about 4 months, indicating that was the average time required for plaintiff’s assembly operations. There ■is no evidence as to whether this was a normal or excessive period of time. In any event, deliveries of end items under contract 957 were accomplished between May 15 'and August 21, 1953, more than a year after the originally scheduled completion date of April 1,1952.
An important Government witness agreed that lack of winterization equipment was plaintiff’s biggest problem, and was the most important cause of the overall delays suffered. However, there is no evidence that Perfection Stove Company was responsible for the delays in furnishing winterization equipment for use in final assembly. Perfection was, in turn, delayed in receipt of a pilot model, which had in turn been delayed by diesel engine problems, as earlier described.
C. Cold Tests
There xvere other concurrent and included delaying factors which contributed to plaintiff’s problems, but they appear to be of secondary importance, when compared with those already mentioned. Although Perfection had been designated as sole source for the heaters, it had not been so designated with regard to performance of cold tests, a problem intimately related to the heater and winterization kit problems just described. The contract lodged responsibility in the contractor for performing cold tests of startup and operation of both types of engines under the three contracts. Perfection, as subcontractor, did not have the cold testing facilities to perform all the specified tests and it so informed plaintiff October 22, 1951. Production of winterization kits could not proceed until cold tests had been satisfactorily concluded.
The District waived certain cold tests Perfection was not equipped to make, and the pilot models for the gasoline generator sets (contracts 961 and 1052) were successfully tested *916 March 25, April 2 and 3, 1952, and 'approved May 14,1952.[8] A similar waiver was made for contract 957 covering the 150 diesel generators, bnt cold tests were delayed by other factors. As previously explained, the diesel pilot model was received by Perfection July 15,1952, from Hill Diesel Company where it had been held up awaiting altitude testing. The District would not approve altitude tests until cold tests had been approved. Based on cold tests conducted August 27, 28 and September 4 and 5, 1952, Perfection reported that the pilot model was in compliance, subject to waiver of some tests. But in its report, Perfection noted an unusual number of “deficiencies in the adjustment, calibration and general assembly of the unit.” The pilot model was shipped by Perfection to plaintiff October 9, and was received October 16, 1952.
D. Contract Modification No. 2
Plaintiff alleges that the Government delayed 6 months in issuing contract modification No. 2 which changed the mounting for the gasoline generators under contract 961 from skid to trailer, and thereby delayed plaintiff’s performance. Shortly after award of this contract, the Engineer Supply Control Office on July 20, 1951, wrote the District to suspend action pending receipt of the above change in mounting, and certain revisions to provide a compartment and hooks for a power cable to be Government-supplied. Drawings and photographs of the required changes were furnished, and plaintiff was asked to quote price and delivery date, which it did August 3,1951. Specifications were furnished, and plaintiff was instructed to order the Government-supplied power cables and ground rods 30 days prior to scheduled delivery of the completed generator sets. Plaintiff was instructed to proceed and did. But, on November 15, 1951, it requested that the actual confirming, written change order be issued, or it would stop work. The Government complied on December 3,1951, when modification No. 2 was issued and accepted by plaintiff.
The delivery schedule set forth therein required completion of the pilot model December 17, 1951, with deliveries *917 at the rate of 10 per week from January 7 to February 15, 1952. On January 23,1952, plaintiff planed an order for the 40 trailers required with Truck & Trailer Equipment Company, specifying immediate delivery of one for the pilot model, and of the remainder starting March 15, 1952. The first trailer was actually shipped April 30, 1952, and the remainder from September 25 to November 6, 1952. Since plaintiff began work on this modification before receipt of the formal modification order, delay in issuance of that formal order did not delay the actual work.
As previously stated, modification No. 2 also required design and fabrication of a special compartment or housing for a Government-supplied power cable. The Government delayed in supplying the cables, or specifications describing them, for over a year, with the result that plaintiff finally designed and fabricated the cable housing itself.
Since plaintiff informed the Government it was ready to ship all 40 generator sets under this contract 961 by November 26, 1952, delays attributable to the cables must have been resolved by that date at the latest. The District did not permit plaintiff to ship by November 26, 1952, stating that production tests were necessary before shipment, and that the pilot model test had not been completed. The 40 generator sets were shipped to the Government at various times from December 19,1952, to January 26,1953.
It is not readily apparent that lack of Government-supplied cables prevented earlier delivery under contract 961, as plaintiff contends, since it seems likely that plaintiff’s letter of November 26, 1952, announcing its readiness to deliver would have otherwise made mention of the prior cable delays. The Government’s prolonged failure to deliver cables or specifications for same to plaintiff was inexcusable, but it does not appear to have caused significant overall delay in plaintiff’s performance, when measured against other contemporaneous problems plaintiff was experiencing on the 150 diesel generator sets, as earlier described.
The presence of 40 completed gasoline generator units in plaintiff’s plant, awaiting permission from the Government to ship, did prevent plaintiff from using that plant space to work on the 150 diesel units under contract 957, as plain *918 tiff contends. But the Government was entitled to a reasonable time within which to test the pilot 'and production models prior to giving plaintiff instructions to ship, and there is no proof that the time taken by the Government for this purpose was unreasonable.
In summary, late issuance of formal written modification No. 2, and tardy furnishing of Government-supplied cables are not condoned, but they were not wrongful acts or omissions causing major delay, such as to warrant favorable consideration of this claim for equitable relief.[9]
E. Badio Interference Suppression Tests
These tests were to be performed by the Government on the pilot models for all three contracts. Plaintiff alleges it was delayed by the Government’s failure to perform them at Fort Monmouth, New Jersey, in a timely manner.
On October 16, 1952, the pilot model for the contract 957 diesel generator was returned after having been cold tested at Perfection Stove Company. On November 7, 1952, the District requested the Signal Corps Laboratory at Fort Monmouth to perform these radio tests on the pilot model scheduled to be delivered by plaintiff on November 12,1952. The laboratory report sent to plaintiff on January 6, 1953, concluded that the generator set conformed to the radio interference suppression specifications, but it described objectionable interferences traced to the battery charging regulator and the output load circuit breaker, requiring special shielding and adjustments.
On January 7,1953, plaintiff informed International Harvester, supplier of the diesel engine, that “rather drastic changes” had to be made in the Harvester engine. Harvester was further asked what action it would take in light of plaintiff’s obligation to furnish the additional equipment recommended by Fort Monmouth. Plaintiff does not charge the Government with delay in the latter’s discharge of its responsibility for performing the radio interference suppression tests on the diesel generator set.
*919 On September 16, 1952, the District orally arranged to have the same test performed on the pilot model for the gasoline generator sets, delivered by plaintiff September 17,1952. In its report dated October 24, 1952, the laboratory concluded that it met specification requirements, but it also described a number of defects it had encountered and corrected prior to achieving compliance. Plaintiff was instructed to correct these discrepancies on production items.
Plaintiff’s contention that it was delayed in delivering completed gasoline generator units from September 6 to November 6,1952, by this test, is not supported by the record. At most the test took from September 17, when the pilot model was delivered, to October 24,1952, when the report on the test was issued. Absent any additional evidence on conditions at the Fort Monmouth Laboratory, it cannot be said that this 37-day period was unreasonable.
F. Altitude Testing
The specifications provided that where the contractor lacked facilities for performing altitude tests, they “shall be conducted in a Government laboratory to be designated by the contracting officer, and shall be performed after all other development tests have been completed.” Since the tests were required in all three contracts, and plaintiff lacked such testing facilities, it requested the District to locate and designate a suitable facility. After some unsuccessful efforts, the diesel pilot model was sent to Hill Diesel for altitude testing on June 5, 1952, but defects in the Harvester engine prevented completion of the test. On December 18, 1952, permission was given to use Navy testing facilities at the Philadelphia Naval Base and the tests were conducted there on January 23, 1953. The tests failed, and the pilot model was returned to plaintiff for correction.
The corrected generator set was returned and retested April 9, 1953, but a defective switch caused a cooling problem. After the cooling system was modified 'by plaintiff, the pilot model passed the final altitude test on April 16, 1953. There is some question as to the adequacy of the Government’s testing facilities, and as a result there was a partial' *920 waiver of test requirements. The delays originating in this test, however, were due essentially to deficiencies in the unit. It is noteworthy that the same test on the gasoline pilot model was performed by Hill Diesel several months prior to the test on the diesel unit, and there is no evidence with respect to test delay on the two contracts for gasoline-driven generator sets.
G. Delco Generators
Plaintiff alleges it was delayed by Government delay in approving its Delco motor, i.e., generator. Prior to July 3, 1951, Delco Products Division of General Motors orally offered to supply the generator components for the two types of generator sets. It further offered to furnish the two pilot model generators in September 1951, and to begin production deliveries 60 days after approval of the pilot model, and to complete them in February 1952.
Plaintiff ordered the 150 generators required for contract 957 on July 13,1951, and the 44 generators required for the other two contracts on August 28, 1951. On November 26, 1951, Delco asked plaintiff to apply to the Government for priority assistance in procuring controlled materials to produce the generators. The Korean War had resulted in adoption of a controlled materials plan to allocate scarce supplies. Plaintiff transmitted the request to the District for action. The District had previously, and on July 23 and August 7, 1951, notified plaintiff that a Defense Order rating had been assigned to the three contracts placing them in a preferential category.
On December 27,1951, the Government approved the pilot model generator for contracts 961 and 1052. Delco shipped two of these generators to plaintiff on December 28,1951, and 10 more on January 17, 1952. Although Delco wrote plaintiff on January 25, 1952, expressing appreciation for plaintiff’s allowing it to schedule deliveries, since the generators were in stock and ready for shipment and, although the same letter announced that 30 more would be shipped by February 18, 1952, only 15 were shipped on January 31,1952, and the remaining 15 were not shipped until September 15,1952. However, it appears that Delco was ready, willing, and able to ship the generators for contracts 961 and 1052 to plaintiff *921 long before plaintiff could use them, and tbat Delco complied with, its delivery responsibilities on these two contracts.
As for the 150 generators ordered July 13, 1951, for contract 957, although the pilot model of the generator was formally approved by the District on December 30, 1952, that approval was on the basis of test reports to the District a year earlier on December 27,1951. Although incomplete, the record shows that on the strength of the test reports, 43 generators were delivered by Delco from January 24 to April 25, 1952, and 50 more were delivered on or about March 31,1953. On June 18, 1953, plaintiff sent an urgent wire to Delco requesting immediate shipment of the balance of the 150 generators required for contract 957 and Delco promised them by June 24, 1953. When the rest were actually delivered is not shown.
In any event, the evidence fails to establish that any delay on the part of the Government in formally approving pilot models of the Delco generators for any of the contracts was ■the cause of delayed delivery of generators by Delco to plaintiff. Delivery of the contract 957 generators began January 24, 1952, presumably on the basis of the test reports of December 27,1951.
T-T- Other Miscellaneous Causes of Delay
Brief mention is made of other possible causes of plaintiff’s delay problems which were mentioned in its claims before the contracting agency, but not thereafter pursued in this and the prior litigation. Those possible delaying factors, not previosly mentioned herein, are:
(a) Housings for the generator sets. Plaintiff had to cancel its first subcontractor because of the latter’s deficient workmanship; and its second subcontractor was ■also delayed in performing.
(b) Costs of extra sets of test reports supplied at Government request but not required by the contracts.
(c) Price reduction for partial payments.
(d) Strike in plaintiff’s plant in spring or summer 1953 affecting performance of contract 957.
It can be seen from all of the foregoing that plaintiff experienced a number of unfortunate delays, many of them due to *922 circumstances “beyond the control and without the fault or negligence of the contractor.”[10] Such delays can support extensions of time within 'which to perform, and relief from a threat of default termination, but under the terms of this contract they would not ordinarily support a claim for monetary relief grounded on delays. To support a money claim, the delays would have to be attributable to direct acts or omissions of the Government acting in its contractual (rather than sovereign) capacity.[11]
Tracing through the tangled skein of delaying factors from which these contracts suffered, it is apparent that the overriding cause of plaintiff’s problems originated in the heaters and winterization kits. Both parties seem to agree on that. It is true that the only heater that was in compliance was a proprietary item of Perfection Stove Company, and that Perfection had been specified as a sole source by the Government. It is also true that when Perfection finally received a pilot model on which it could design a winterization kit, it found that a different model of its heaters would be required than the one specified. But delay in delivery was not the fault of this designated sole source supplier. Perfection had itself been delayed by deficiencies and delays affecting the diesel engine, and those were causes not attributable to Government action or inaction.
There is, by way of further example, no explanation for plaintiff’s delay in ordering heaters from Perfection for 2 months after award to plaintiff of contract 957 for the diesel-driven sets. Perfection could not design the winterization kits nor supply the heaters until plaintiff had provided a pilot model containing a diesel engine, and until that pilot model had in turn passed a cold test and an altitude test. Although the above recital of facts indicates that Government administration of these urgent contracts was not in all respects exemplary, the root causes of the delays and consequent increased costs were defects in the diesel engine, tardily supplied by Plarvester. This delayed the altitude and cold tests on the pilot model until September 5,1952.
*923 Some 25 days later (October 1, 1952), Perfection bad designed the required winterization kit, and bad concluded that a different model of its beater from that specified would be required. There is no evidence that this 25-day period for design of the winterization kit was unreasonable; nor is there any evidence that plaintiff was delayed by the determination that a Series 590 heater was required instead of the Series 480 originally specified. There is, moreover, some indication that plaintiff’s decision thereafter to cancel the original Perfection subcontract on December 9,1952, and to fabricate the winterization kits itself, may have been ill-advised and ultimately served to delay rather than expedite end item deliveries under plaintiff’s contracts.
Although the reference to “equitable claim” employed in 28 U.S.C. § 2509 is not confined to the strict legal definition of that term but embraces the concept of “equity” in a broad nonjuridical sense,[12] and although a claim for equitable relief need not therefore be limited in all cases to circumstances where a wrongful act or omission of the Government is involved,[13] this is not deemed a case warranting equitable relief. Circumstances in which a Government contractor is delayed for reasons beyond its control, but not by reason of wrongful acts attributable to the other contracting party, are commonplace in Government procurement. Plaintiff’s litigation on the legal grounds of breach of contract terminated in settlement of that action, as earlier described. This present application for equitable relief would, if favorably considered, set this plaintiff apart from any other Government contractors who have found themselves in similar circumstances. Payment of its losses as alleged would therefore constitute a gratuity.
For all of the foregoing reasons, it is concluded that plaintiff has neither an equitable nor legal claim against the United States for the losses it incurred in the performance of these contracts. Viewed from the standpoint of equity in *924 a broad nonjuridioal sense of that term, relief provided by the United States from those contract losses would be a gratuity.
This determination is hereby submitted to the Chief Commissioner for transmittal to the United States Senate.

The separate findings of fact accompanying the opinion are not printed since such facts as are necessary to the decision are contained in the opinion.

 A memorandum of pretrial conference filed June 9, 1971, recorded that the “liability issue is tentatively severed from damage issue for initial disposition.”

 As amended, 55 Stat. 83S, 839 ; 64 Stat. 1257.

 In the same case, at an earlier state, 191 Ct. Cl. 607, 423 F. 2d 1362 (1970), plaintiff’s petition had been dismissed under the regular jurisdiction of this court by reason of a release, and on legal grounds. It was returned to us as a Congressional Reference for consideration as a claim for equitable relief under the same statutory authority governing consideration of this case.

 That is, tliey specified results desired, ratlier than the specifics for accomplishing those results.

 Although plaintiff makes no claim with respect to delays in obtaining gasoline engines from Continental Motors Corporation for contracts 961 and 1052, Continental’s failure to ship gasoline engines on schedule also delayed submission of that pilot model generator set for testing and, therefore, also delayed completion of contracts 961 and 1052.

 Plaintiff ordered 44 winterization kits from Perfection for contracts 961 and 1052, which were delivered in June and July 1952. There is no claim of delay as to them.

 No change order was issued to cover the more expensive heater and the record is incomplete on this point. No claim appears to have been made for the apparent additional cost of $24,450 (150 x $163).

 Plaintiff was instructed to adjust the battery box bypass.

 It is presumed that modification No. 2 provided the equitable adjustment in contract price and time required for the explicit changes it ordered.

 Quoted from General Provision 10 of the contract, “Default.”

 See & cf. Horowitz v. United States, 267 U.S. 458 (1925).

 Burkhardt v. United States, 113 Ct. Cl. 658, 666, 84 F. Supp. 553 (1949).

 See & cf. Ghitescu v. United States, 201 Ct. Cl. 823, 828 (1973) ; Adler Constr. Co. v. United States, 191 Ct. Cl. 607, 615, 423 F. 2d 1362, 1366 (1970), cert. denied, 400 U.S. 993 (1971) ; Town of Kure Beach v. United States, 168 Ct. Cl. 597 (1964) ; and Rumley v. United States, 169 Ct. Cl. 100, 108 (1965).